Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/07/2017 09:11 AM CDT

Clarence E. Mock III, Special Administrator
of the Estate of Carl Landgraf, deceased,
appellant and cross-appellee, v. Gail L.
Neumeister and Marlene Neumeister,
appellees and cross-appellants.

___ N.W.2d ___

Filed April 14, 2017.    No. S-15-1226.

1. **Property: Undue Influence: Equity: Appeal and Error.** An action to
   set aside inter vivos transfers of property on the basis that they were
   made as the result of undue influence is one in equity and, as such, is
   reviewed by an appellate court de novo on the record.
2. **Judgments: Evidence: Appeal and Error.** Despite de novo review,
   when credible evidence is in conflict on material issues of fact, the
   appellate court will consider and may give weight to the fact that the
   trial court observed the witnesses and accepted one version of the facts
   over another.
3. **Costs: Appeal and Error.** The decision of a trial court regarding taxing
   of costs is reviewed for an abuse of discretion.
4. **Undue Influence: Property: Proof.** The elements which must be
   proved in order to vitiate a transfer of property on the ground of undue
   influence are that (1) the transferor was subject to undue influence, (2)
   there was an opportunity to exercise such influence, (3) there was a
   disposition to exercise such influence, and (4) the transfer was clearly
   made as the result of such influence.
5. **Undue Influence: Deeds: Words and Phrases.** The undue influence
   which will void a deed is an unlawful or fraudulent influence which
   controls the will of the grantor.
6. **Deeds: Conveyances: Undue Influence.** A court, in examining the mat-
   ter of whether a deed was procured by undue influence, is not concerned
   with the rightness of the conveyance but only with whether it was the
   voluntary act of the grantor.

7. **Deeds: Undue Influence: Proof.** The burden is on the party alleging the execution of a deed was the result of undue influence to prove such undue influence by clear and convincing evidence.

8. **Evidence: Words and Phrases.** Clear and convincing evidence is evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved.

9. **Undue Influence.** Mere suspicion, surmise, or conjecture does not warrant a finding of undue influence; instead, there must be a solid foundation of established facts on which to rest the inference of its existence.

10. **Appeal and Error.** To be considered by an appellate court, an error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

11. **Undue Influence: Proof.** Undue influence is usually difficult to prove by direct evidence, and it rests largely on inferences drawn from facts and circumstances surrounding the testator's life, character, and mental condition.

12. ____: ____. It is not necessary for a court in evaluating the evidence of undue influence to separate each fact supported by the evidence and pigeonhole it under one or more of the four essential elements. The trier of fact should view the entire evidence and decide whether the evidence as a whole proves each element of undue influence.

13. **Equity: Costs.** The taxation of costs in equitable actions is governed by Neb. Rev. Stat. § 25-1711 (Reissue 2016).

14. **Costs: Statutes.** Unlike Neb. Rev. Stat. §§ 25-1708 and 25-1710 (Reissue 2016), which provide that costs shall be allowed of course to the successful party, Neb. Rev. Stat. § 25-1711 (Reissue 2016) gives the court discretion to tax costs and to apportion such costs between the parties.

Appeal from the District Court for Otoe County: David K. Arterburn, Judge. Affirmed.

Thomas M. Locher and Joseph J. Kehm, of Locher, Pavelka, Dostal, Braddy & Hammes, L.L.C., and William R. Reinsch, of Reinsch, Slattery, Bear & Minahan, P.C., L.L.O., for appellant.

Jeanette Stull and Justin J. Knight, of Perry, Guthery, Haase & Gessford, P.C., L.L.O., for appellees.

Heavican, C.J., Wright, Miller-Lerman, Cassel, and Stacy, JJ.

Cassel, J.

## I. INTRODUCTION

This is an appeal from a decree refusing to set aside lifetime transfers of real estate claimed to be the result of undue influence. The ultimate issue before the district court and now before this court is whether the appellant proved by clear and convincing evidence that the deeds were the result of undue influence. Upon our de novo review, we conclude that the appellant failed to meet his burden of persuasion. And because we find no abuse of discretion by the district court in declining to tax costs of depositions, we affirm the district court's decree.

## II. BACKGROUND

This is a fact-intensive case. The district court heard testimony from 33 live witnesses and received over 200 exhibits during an 8-day trial. After briefly summarizing the contested transactions and the proceeding challenging them, we will set forth the evidence from the trial at considerable length.

### 1. Transactions Attacked

On June 11, 2011, a couple of weeks prior to Carl Landgraf's 87th birthday, he executed two joint tenancy warranty deeds conveying approximately 1,000 acres of his farmland to Gail L. Neumeister and Marlene Neumeister. In July 2012, Landgraf executed deeds to fix an error in the earlier deeds. The total recited consideration for the four deeds was $4.

### 2. Proceeding Attacking
### Transactions

After Landgraf's death, the probate court appointed Clarence E. Mock III as special administrator of Landgraf's estate. Mock sued the Neumeisters, alleging that the deeds were the product of undue influence by the Neumeisters and should be set aside.

The Neumeisters denied that the deeds were the product of undue influence. But in the event that the district court set

aside the transfers, they filed a counterclaim requesting to be compensated for improvements made upon the land following the transfer.

## 3. Facts Developed at Trial

### (a) Before Transaction

#### (i) Landgraf's Family

Landgraf was born in 1924, the youngest of three sons. Neither Landgraf nor his brothers married or had children. Landgraf and his brother, Jerome Landgraf (Jerome), were preceded in death by their parents and brother. They lived nearly their entire lives on the property originally owned by their parents. Between the two brothers, Jerome was the spokesperson and decisionmaker. Their house lacked modern amenities. It had limited electricity. It lacked plumbing and a working furnace or stove. Because there was no bathroom, Landgraf often used a bucket for a toilet.

The Catholic faith was important to Landgraf's family. Landgraf attended Mass and holy days regularly. Items signaling faith and devotion decorated Landgraf's house. According to a relative's testimony, there was a desire to "pay back" the Catholic church because the church helped Landgraf's grandparents when they immigrated to the United States due to religious persecution.

In 1995, Jerome began living in a nursing home. He died on August 25, 2000. Landgraf inherited Jerome's interest or was a joint owner with right of survivorship with Jerome for Jerome's interest in personal and real property.

#### (ii) Landgraf's Land

Landgraf owned several tracts of farmland in Otoe County, Nebraska. His home was located on a farm near Dunbar, Nebraska, which consisted of approximately 1,000 acres of land. When Landgraf's father was in charge, the family farmed most of the land. After Landgraf's father died, Landgraf and Jerome "kept putting more and more to grass." They farmed

some of the land, but primarily used it for livestock. After Jerome entered the nursing home, this land was farmed by Gail for approximately 10 years. Landgraf also owned farms some distance from his home. These farms were composed of approximately 80 acres and 160 acres and were farmed by Robert and Jacqueline Knake and Robert Witte, respectively.

### (iii) Relationship With Farmers

#### a. Neumeisters

In 1978, Gail began helping his brother perform haying work for Landgraf and Jerome. When Gail's brother moved in 1983, Gail took over the haying work. In 1995, after Jerome entered the nursing home, Gail stopped haying and began farming Landgraf's land. He had a 60-40 lease arrangement with Landgraf in which Landgraf received 40 percent of the income and paid 40 percent of expenses.

In 2004, Gail told Landgraf that he did not want to farm the land anymore and Landgraf became very upset. According to Gail, Landgraf offered to cosign on a $67,000 note if Gail continued to farm the land. The lender subsequently sued the Neumeisters for failure to pay the loan. In May 2006, the day before Gail's equipment and other collateral were to be taken by the lender, Gail wrote a check for $75,000 payable to himself that Landgraf signed.

Landgraf's attorney, Richard Hoch, tried to work with the Neumeisters to document some obligation to repay Landgraf, but he was unsuccessful because the Neumeisters never returned the instruments that Hoch prepared for their signatures. According to Gail, the arrangement to repay Landgraf was for Gail "to keep farming or be around" and to "work it off." But by the time the loan was paid off, Gail had ceased farming. Gail stopped farming Landgraf's land in 2005, because "the input costs were higher than the output costs." Gail testified that he worked off the debt by controlling weeds, cleaning a road ditch, cutting trees, fixing a roof, and various other things.

Gail also claimed that he worked off the debt by performing work for Landgraf under the Environmental Quality Incentives Program (EQIP). This was a "cost share" program with the government concerning conservation work. Landgraf had three 10-year EQIP contracts. Gail was the "operator" on the contracts and also acted as the contractor doing the conservation work. He was to perform the work without being compensated by Landgraf.

Yearly status reviews were performed on EQIP contracts to check progress. Because costs increased every year, there was an incentive to complete the work under the contracts sooner rather than later. Gail failed to perform the work in a timely manner. In 2007, with essentially only 2 years left on the contracts, only 30 percent of the work had been completed. If the contracts were not completed as required, the landowner—i.e., Landgraf—was subject to liquidated damages.

A resource conservationist with the Natural Resources Conservation Service testified that Landgraf had "a hard time understanding what was going on" and expressed fear about the potential penalties. The conservationist communicated with Hoch about drafting a letter on Landgraf's behalf to request that the contracts be canceled. The conservationist felt that Landgraf's "lack of understanding, his state of mind, [and] his anxiety were circumstances that would warrant" the waiver of penalties upon cancellation. Hoch testified that Landgraf was upset that the work under the contracts was not getting accomplished, and Hoch assisted Landgraf in obtaining cancellation without penalties. The conservationist later met with Landgraf and Gail, and he testified that Gail was very angry about the cancellation of the contracts and that Landgraf was very nervous and uncomfortable. At trial, Gail explained that he was "a little hurt because the amount of work that I put into it, I never got paid for."

Landgraf was concerned about Gail's not farming the land. Gail continued to store his equipment on Landgraf's land after he stopped farming for Landgraf. There was also evidence

that Gail ran a cow/calf operation and kept the livestock on Landgraf's pasture without compensating Landgraf. Hoch suggested that Landgraf find another tenant, but Landgraf was reluctant to terminate Gail's lease. Gail was unsure whether he continued to have a lease with Landgraf after he stopped farming the land, but he testified that he did not pay anything on any such lease from and after 2005. Gail knew that others were interested in farming Landgraf's land. He testified that he suggested Landgraf should rent the land to someone else and that he brought someone to try to rent pasture from Landgraf but Landgraf refused. The Knakes offered to farm the land, but Landgraf declined the offer due to uncertainty about Gail's reaction. Robert testified that Landgraf complained about not getting enough money off the land to pay the taxes, but that Landgraf feared Gail would never repay him for the loan if Landgraf leased the land to someone else. Hoch obtained a proposal from an individual concerning a 5-year lease, but Landgraf similarly did not accept it.

In 2005, Gail had a discussion with Landgraf about a sale and gift of approximately 10 acres of Landgraf's land. The land included a residence across the road from Landgraf's home. After completion of a survey, Landgraf told Hoch that he did not want to sell all that land. The transaction did not occur. According to Gail, he declined the gift because it would cost too much money to rehabilitate the house on the property. Hoch testified that "major work" needed to be done to restore the house, but he had the impression that the transaction did not occur because Landgraf disagreed with where the stakes were laid out by the survey and did not want to convey that much property.

There is no dispute that the Neumeister family helped Landgraf. If Landgraf or Jerome needed something, they called the Neumeisters for help. Marlene testified that she visited Landgraf two to three times a week after Jerome died. An individual who farmed across the road from Landgraf observed Gail help Landgraf but never saw anyone else help

him. Another witness observed Gail helping Landgraf "[a] lot." Gail considered himself to be Landgraf's primary caregiver after Jerome died. Marlene testified about how Gail missed time with his family in order to help Landgraf. Even after Gail ceased farming Landgraf's land in 2005, he continued to help Landgraf with whatever Landgraf needed or wanted and visited Landgraf "probably every other day or every three days." Gail helped Landgraf because they were "pretty close friends."

### b. Knakes

The Knakes had long farmed the 80-acre parcel owned by Landgraf. Robert farmed it for 61 years, and Jacqueline helped farm the land since 1973. They—like Gail—had a 40-60 crop share arrangement with Landgraf.

### (iv) Earlier Estate Planning

### a. 1999 Estate Planning Documents

In 1999, Hoch prepared a will and a charitable trust for Landgraf. Landgraf's will named Gail as the personal representative and bequeathed all farm equipment to him. It gave various sums of money to a number of recipients, including Gail, and gave the remainder of the estate to the charitable trust. The charitable trust specified that upon Landgraf's death, all non-real-estate assets would be held in trust for 25 years and all net income would be divided in one-fourth interests and paid on an annual basis to St. Mary's Catholic Church of Nebraska City, Nebraska; St. Benedict's Catholic Church of Nebraska City; St. Paulinus Catholic Church of Syracuse, Nebraska; and Lourdes Central Catholic School of Nebraska City. The charitable trust directed that the real estate be held for 50 years after Landgraf's death and then sold, with the proceeds divided equally between the same four charitable beneficiaries.

Gail drove Landgraf to the law office and watched Landgraf sign the documents. Gail testified that during the meeting,

Landgraf whispered to him that "this isn't the way I really want it." Gail told Landgraf that he could either sign the documents or ask Hoch to change them.

Hoch testified that Landgraf spent a lot of time thinking about his estate planning, and Hoch could not imagine that the documents did not reflect Landgraf's wishes. According to Hoch, Landgraf knew what he wanted in terms of estate planning: He wanted to have a trust, to have his farmland not sold, and to have the Catholic church as the final recipient. Hoch also testified that Landgraf "was not a sophisticated client" and that he needed somebody to help him with legal and financial matters.

### b. Relationship With Hoch
### After 1999

Hoch continued to represent Landgraf after preparing the 1999 estate planning documents. Hoch assisted with Jerome's estate by closing the guardianship and conservatorship matter and opening an intestate estate. As noted, Hoch helped Landgraf with regard to the loan that Landgraf cosigned and the EQIP contracts. But Hoch did not recall performing any legal work for Landgraf after 2007.

A witness recalled an event at a bank in 2006 in which Landgraf approached Hoch and "was venting some of his anger" and was "evidently and apparently, very . . . troubled with a previous discussion; perhaps, an argument." Gail testified that in 2007, Landgraf told him that he had been "bullied" by Hoch but that Landgraf would not say what Hoch had done.

Hoch described his last memory of seeing Landgraf, which occurred in 2007. He saw Landgraf crying and shaking on a street in Nebraska City, and Landgraf said that he needed Hoch's help. Landgraf told Hoch that "they're trying to take my land" and that "[t]hey're trying to make a new will." Landgraf told Hoch that Gail and John Horan, an attorney, were trying to make Landgraf "change things and take his land." Hoch felt

that Landgraf exhibited diminished capacity at that time. He discouraged Landgraf from continuing a business relationship with Gail, but Landgraf did not heed Hoch's advice. Hoch called Horan and relayed what had happened. Horan recalled that Hoch told him Landgraf was mad at Hoch because Hoch told Landgraf that Landgraf was "probably going to have to go in a nursing home."

### c. 2007 Meeting With Horan

In June 2007, Gail called Horan and said that he wanted Horan to speak with Landgraf about estate planning. Horan and two other attorneys had represented Gail in 2002 or 2003 in connection with an automobile accident. According to Gail, Landgraf selected Horan and Gail speculated that it could have been because Horan provided services for Gail's father-in-law, with whom Landgraf spoke. According to Jacqueline, Landgraf said that Gail talked him into going to see Gail's attorney rather than Hoch and that Landgraf did not want to do so.

Before Horan met with Landgraf, he received a call from Hoch expressing concern that Landgraf may not be doing what Landgraf wanted to do. When Horan met with Gail and Landgraf about changing Landgraf's will, Landgraf stated, upon Horan's inquiry, that he wanted Gail to be present during the consultation. Landgraf told Horan that he was thinking about "gifting or selling" 240 acres to the Neumeisters. Landgraf expressed concern about having to pay capital gains taxes if he sold the land, and Horan explained that a gift would not involve any out-of-pocket expense to Landgraf in taxes. The topic never went beyond dealing with the 240 acres of land. The meeting concluded by Horan's telling Landgraf to let Horan know whether Landgraf wanted to sell the property or give it away, and Horan would then prepare the appropriate paperwork. Horan never heard back from Landgraf. He did not have any concerns that Gail was influencing Landgraf.

### (v) Adult Protective Services
### Investigations

The Nebraska Department of Health and Human Services investigated two intakes concerning Landgraf. The first intake, in 2007, was prompted by Landgraf's passing out at a funeral, being filthy and confused, and having a sunken face and grayish coloring. Landgraf thanked the adult protective services worker for checking on him, assured the worker that he did not need assistance, and asked not to be checked on again. The department found self-neglect.

In August 2009, the department received another intake regarding Landgraf. This intake concerned financial exploitation by Gail. The worker testified that Landgraf was "very guarded with his information and at times possibly a little paranoid." When asked if Landgraf expressed being upset with Gail about anything, the worker testified that "all he told me was that it was being taken care of; that I did not need to worry about it." Landgraf again refused any assistance. The worker found no evidence of wrongdoing by Gail. He testified that Landgraf was not a vulnerable adult, that he could make his own decisions, and that he was able to "protect himself."

### (vi) Other Pertinent Testimony

#### a. Piper Testimony

Irene Piper met Landgraf in approximately 2008. She began taking him pies on a regular basis. Landgraf told her that he never wanted to see his land sold. With land and equipment being so expensive, Landgraf felt that it was impossible to be able to buy both land and equipment to farm, so he planned to give—not sell—his land "to his farmers." These discussions occurred between 2008 and 2011. Landgraf never mentioned wanting to give his land to a church. He was upset that someone had given money directly to a church in order to keep the church open and, shortly thereafter, the church closed; thus, the money did not benefit the community.

Piper met Gail on one occasion, and Landgraf introduced him as the person who took care of Landgraf. Piper did not feel that Gail interfered with her ability to communicate with Landgraf. She testified that Landgraf did not express any fear of Gail or show any sign that he was uncomfortable around Gail. Piper testified that she stopped taking pies to Landgraf, and instead sent the pies through Gail, when she determined that Landgraf was becoming increasingly frail.

### b. Easter Testimony

Arlene Easter knew Landgraf from when she and her husband did custom farming for him and from selling him crop insurance. She testified that Landgraf wanted a popular level of insurance coverage and, even though she sensed that Gail likely wanted better coverage as the operator, she thought Landgraf got his way in those situations. Easter always felt like Landgraf was sufficiently able to make decisions in both the crop insurance and the banking context. She had the impression that Gail and Landgraf were friends and that they liked one another.

### c. Knake Family Testimony

Jacqueline felt that Landgraf's mental capacity remained consistent over the years. Landgraf became more talkative after Jerome's death, and Jacqueline would speak with him in her vehicle in Landgraf's yard because he would not allow her in his house. If Landgraf heard a vehicle drive by, he would ask if it was Gail. Jacqueline testified that Landgraf seemed to have a sigh of relief if it was not Gail driving by. Landgraf told the Knakes that shortly after they would leave, Gail would arrive and want to know why the Knakes were there.

Craig Knake, the Knakes' son, recalled an occasion in 2009 where he and Landgraf spoke for 4 to 5 hours in Craig's vehicle. Every time someone drove by, Landgraf seemed nervous and asked if it was Gail. Late that night, Gail pulled in behind Craig and Landgraf and asked what Craig was doing there. Craig testified that Landgraf "kind of went to mute." On other

occasions when Craig spoke with Landgraf, he would notice
Gail drive by several times. According to Craig, Landgraf
shook when discussing Gail. Landgraf told Craig that Gail said
Landgraf needed to see a new attorney, that Landgraf said he
did not want to go, but that Gail grabbed Landgraf by the arm
and said they needed to go talk to the attorney.

Landgraf told Robert that Gail wanted a gift of some land,
and Robert suggested that Landgraf give Gail "the 380 across
the road" if Gail could get the money to farm it. Robert had the
impression that Landgraf and Gail had a close relationship and
that Landgraf trusted Gail. He thought that Gail had "some"
influence over Landgraf's business decisions.

### d. Testimony Concerning Susceptibility
### to Undue Influence

Dr. Bennett Blum, a physician specializing in psychiatry
with subspecialties in forensic psychiatry and geriatric psy-
chiatry, performed an assessment related to the deeds at issue.
He never met Landgraf, but he reviewed depositions, legal
briefs, discovery responses, the deeds at issue, documents
from various attorney files, medical records, records from the
Department of Health and Human Services, and police reports.
He testified that "any type of decreased general function leads
to increased dependency or increased reliance on someone
else and, therefore, could increase the susceptibility to being
manipulated and, therefore, to undue influence." Blum opined
that during the period from 2007 through 2013, Landgraf suf-
fered from a class of cognitive ability referred to as "impaired
executive functions" that was mild to moderate in severity. He
testified that the ability to understand deeds and the conse-
quences of executing deeds or contracts required intact execu-
tive functions. According to Blum, people who are particularly
stubborn or rigid are one of the easiest types of personalities
to manipulate. Blum believed that Landgraf's cognitive impair-
ment existed during 2011 and that Landgraf was unduly influ-
enced in connection with the deeds.

At least eight witnesses familiar with Landgraf testified that he was stubborn and not easily persuaded. Hoch testified that Landgraf did not make decisions on the spur of the moment. And an individual who assisted Landgraf with the preparation of tax documents testified that Landgraf always seemed to be of sound mind.

Other testimony offered insight on Landgraf's relationship with Gail. An individual who owned land next to Landgraf testified that in March 2011, Landgraf told him that things were "not too good," because the Neumeisters were "not doing what they're supposed to be doing." When asked why Landgraf did not just tell them to leave, Landgraf said that he could not and that he was "scared of them." Another witness testified that Landgraf depended on Gail. But at least six witnesses did not believe that Landgraf was afraid of Gail. Others testified that Landgraf did not express resentment or anger toward Gail.

### (b) 2011 Estate Planning

Gail testified that in 2011, Landgraf wanted to change his estate planning documents after an incident in which Landgraf's pastor asked Gail to speak to Landgraf about getting his property in better shape. Gail testified that when he told Landgraf about the conversation, Landgraf "got all upset and slapped his legs and says why are they always in my business?" The pastor did not recall any such conversation.

According to Gail, Landgraf handed him an envelope and asked him to have Marlene type the writing on the envelope. Neither Gail nor Marlene discussed the notes on the envelope with Landgraf. Marlene typed the notes onto three pages of paper, which pages were half filled, at most. Landgraf's signature appears on two of the three pages, but Gail did not recall when or why Landgraf signed those pages.

After Marlene typed the notes, Landgraf wanted to know what lawyer he could see. Gail mentioned Hoch and Horan, but Landgraf said no. Gail and Landgraf drove to Humboldt,

Nebraska, to see Kelly Werts. Gail testified that he did not know Werts or anyone at that law firm, although a secretary in the firm testified that Gail worked with her husband.

Landgraf told Werts about his desire to change his estate plan. Werts felt that Landgraf seemed alert and intelligent. Gail testified that at the time of that meeting, he had no idea how Landgraf wanted to change his estate. Werts testified that when it became clear estate planning was the focus of the meeting, Werts asked Landgraf if Gail could stay in the room and Landgraf said yes. According to Werts, Gail's role during the meeting was as "a bystander," but he clarified some details regarding the EQIP program. Werts saw no evidence that Gail had influenced Landgraf to meet with Werts or that Gail was influencing any decisions that Landgraf made during the meeting.

Werts provided insight on why Landgraf did not return to Hoch for changes to Landgraf's estate planning documents. He testified that Hoch had earlier refused to make the changes that Landgraf wanted. According to Werts, Landgraf expressed "a general frustration that [Hoch] wasn't doing what [Landgraf] wanted done specific to current changes that he wanted to make" and referred to Hoch's interference in "making [Gail] a . . . tenant on a farm and some [Farm Service Agency] programs and EQIP programs." Werts thought that Landgraf believed all the Nebraska City attorneys were "in cahoots" with one another and felt that if he spoke with an attorney from out of town, there may not be as much sharing of information.

Landgraf handed Werts the typewritten sheets with Landgraf's instructions, and Werts went through them line by line to confirm that they represented Landgraf's wishes. Landgraf told Werts that he wanted to give the farm to the Neumeisters in exchange for their paying Landgraf's bills. Landgraf wanted to give 160 acres of land as an outright gift to the Neumeisters and then to sell the other acres to the Neumeisters at $350 per acre—a sale that Werts acknowledged

would be significantly less than fair market value. Landgraf wanted to give the Knakes and Witte the lands they were respectively farming upon Landgraf's death. Landgraf did not want money to be distributed to the specified charities outright; instead, he wanted it to be held in trust and "doled out" as needed by the charities.

Based on the meeting, Werts' understanding was that Landgraf's ultimate goal was to have Gail pay his bills. He suggested that a better structure, which would be easier to explain on a tax return, would be to sell some land for a fair market price to the Neumeisters and then to give as a gift the balance of the acres. Thus, Werts prepared deeds giving the Neumeisters 852.82 acres as a gift and transferring 148.09 acres to them in return for a promissory note of $296,180. Werts also prepared a trust deed for the Neumeisters to sign in order to secure payment of the note with a lien on the property.

Werts drafted the "Carl Landgraf Revocable Living Trust." The trust directed that upon Landgraf's death, the trustee—Gail—was to distribute real estate to the Knakes and Witte and all remaining real or tangible personal property held by the trust to Gail. Upon Landgraf's death, any indebtedness owed by the Neumeisters was forgiven. According to the document, the remainder of the trust property was to be held and managed for seven designated charities, which included the four charities named in the 1999 charitable trust. Fifteen years after Landgraf's death, the trustee was instructed to distribute any remaining principal and interest equally to St. Mary's Catholic Church in Nebraska City and St. Paulinus Catholic Church in Syracuse.

On June 11, 2011, in addition to the two joint tenancy warranty deeds at issue, Landgraf also signed the Carl Landgraf Revocable Living Trust and powers of attorney naming Gail as power of attorney for both financial matters and health care decisions. The secretary at Werts' law firm testified that she would not have notarized the deeds if she had concerns

that Landgraf was being unduly influenced at the time they were signed. Werts was not present on either occasion when Landgraf signed the deeds conveying land to the Neumeisters. The Neumeisters did not sign the promissory note or the trust deed prepared by Werts; Gail testified that Landgraf did not want the Neumeisters to sign them.

Landgraf gave the property to the Neumeisters outright rather than holding it in trust, and Gail testified that Landgraf said "now you can deal with everything." Gail "figured [Landgraf] was tired of the people hounding him and bugging him." Gail explained that "the county [had told Landgraf to deal] with the trees [and] the thistle problem" and that others were telling Landgraf what he should be doing with the farm. Werts testified that there was some urgency on Landgraf's part in getting the deeds prepared so that Gail could commence farming.

### (c) After Transaction

#### (i) Farming

After the deeds were signed, Gail began farming the property. He had a good crop and did not share any of the proceeds with Landgraf.

#### (ii) Post-Transfer Payments

Landgraf continued to live in his house after giving the property to the Neumeisters. Gail testified that the understanding was that he would take care of all of Landgraf's bills as long as Landgraf lived, including electric bills, telephone bills, and groceries. The expenses were to be paid with Gail's money. Landgraf's money would be used if Landgraf wanted "something special" and for contributions to the church, medical expenses, and nursing home costs. However, the evidence showed that Gail paid for some things, such as Landgraf's power bill and attorney fees, with Landgraf's money.

Gail was supposed to use his money to pay the real estate taxes on the land leased by the Knakes and Witte. An exhibit

showed that Gail generally used his funds to pay those taxes for the second half of the 2010 taxes through 2014. However, Landgraf paid the second half of the taxes for 2011. Gail testified that Landgraf did so because Landgraf needed some expenses to offset the extra money that the Witte property was going to bring. After Landgraf died, Gail paid the taxes out of Landgraf's revocable trust.

### (iii) Reliance on Gail

In the fall of 2011, Landgraf began driving less and Gail provided him with transportation. When Landgraf completely ceased driving, Gail drove Landgraf to Mass every week.

An exhibit containing telephone records showed Landgraf's telephone calls. Between January 30, 2012, and January 24, 2013—when Landgraf entered the nursing home—Gail either called or received a call from Landgraf's telephone line 6,142 times. Those calls accounted for 81 percent of all of Landgraf's incoming or outgoing telephone calls during that time period.

### (iv) Landgraf's Hospitalization
### and Stay in Nursing Home

On January 25, 2013, Gail took Landgraf to a hospital. When Landgraf arrived at the hospital, he was covered with fecal matter. Landgraf was then moved to a nursing home. Gail visited Landgraf at the nursing home almost every day. The director of social services at the nursing home testified that when Landgraf became upset, he would want to talk to Gail and would become calm after doing so.

Landgraf had anxiety and fear about theft of his property at the farm. To try to resolve this fear while Landgraf was in the nursing home, Gail and Landgraf planned to erect a building on the farm and to move the contents of Landgraf's house and outbuildings into it. They planned to put a bedroom, kitchen, and bathroom in one corner of the building for Landgraf's use. Gail purchased materials for the building using funds from Landgraf's revocable trust.

On March 6, 2013, Landgraf had an emergency surgery. Gail was present for the surgery. The following day, Landgraf returned to the nursing home. Also on March 7, Gail used the power of attorney to write a check transferring money from Landgraf's personal checking account to the revocable trust account in order to cover the cost of the building materials and the nursing home payments. On March 10, Landgraf died unexpectedly. Because the funds from the March 7 check were not deposited until March 12—2 days after Landgraf's death—Gail reimbursed Landgraf's estate from the trust in the amount of $47,500. Gail ultimately did not construct the building due to Landgraf's death.

### (v) Criminal Investigation

In May or June 2013, the Nebraska State Patrol received a complaint about a large amount of property that had been transferred from Landgraf to Gail for little consideration. There was concern that Landgraf was coerced or not competent to transfer that property. A criminal investigator interviewed Gail twice concerning the circumstances of the property transfer. Gail told the investigator that the idea to transfer the property was Landgraf's and that Landgraf wanted the individuals who farmed the ground to own the property after Landgraf's death. Gail falsely told the investigator that Landgraf went to Werts' office without Gail and that Landgraf never loaned Gail money. After subpoenaing bank records, the investigator was satisfied that Gail had not taken actions to benefit himself.

### 4. PERTINENT MOTIONS
### DURING TRIAL

At one point during the trial, the Neumeisters moved to dismiss for lack of evidence. Counsel explained, "I know [Mock] hasn't officially declared that [he has] rested, but for purposes of preserving the record, my understanding from the case law is that's the bench trial equivalent of a directed verdict." The district court overruled the motion.

At the end of the Neumeisters' case in chief, Mock moved to dismiss the Neumeisters' counterclaim. The district court overruled the motion.

At the close of all the evidence, the Neumeisters renewed their motion to dismiss for want of evidence. Mock also renewed his motion to dismiss the Neumeisters' counterclaim. The district court overruled both motions.

Also at the close of the evidence, the Neumeisters submitted their motion to determine and tax costs. They requested costs of $3,025.59.

### 5. District Court's Decree

Following the trial, the district court entered a comprehensive 38-page decree. The court stated that it must "consider a contrasting issue in the realm of the burden of proof." The court explained:

> [I]t is not completely clear . . . whether proof of a confidential or fiduciary relationship coupled with such suspicious circumstances in a conveyance case strictly applies. The Court does believe, based on the language found in [*In re Estate of Clinger*[1]], however, that it is likely applicable. As previously stated, the Supreme Court has clearly delineated a higher standard of proof for the contestant with regard to cases of conveyance as opposed to will contests. Therefore, there is some precedent for treating the two scenarios differently. Ultimately, the case law is clear that the contestant ([Mock]) carries a clear and convincing burden of proof in order to prevail on his claim of undue influence and, therefore, must prove those elements accordingly. This Court will certainly consider any and all evidence of a confidential or fiduciary relationship coupled with suspicious circumstances . . . that have been proven in this case in determining whether [Mock] has met his burden. But the ultimate burden will remain with [Mock].

---

[1] *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015).

The district court found that evidence showed a confidential relationship between Landgraf and Gail prior to the execution of the 2011 deeds and trust. The court reasoned that because significant evidence existed which would both support and negate an inference that the deeds were the result of undue influence, it could not find that Mock had met his burden of proof by clear and convincing evidence. The court therefore found in favor of the Neumeisters on the claim of undue influence and determined that their counterclaim was moot.

The court sustained the Neumeisters' motion to tax costs as to mileage fees, witness fees, and postage. The court overruled the motion as to deposition costs.

Mock appealed, and the Neumeisters filed a cross-appeal. We granted Mock's petition to bypass review by the Nebraska Court of Appeals.

### III. ASSIGNMENTS OF ERROR

Mock assigns that the district court erred in (1) "failing to set aside the disputed instruments because [Mock's] evidence shows a confidential or fiduciary relationship coupled with suspicious circumstances sufficient to justify an inference of undue influence," (2) "failing to set aside the disputed instruments because [the Neumeisters] failed to rebut the inference of undue influence," and (3) "failing to dismiss the counterclaim of [the Neumeisters] as a matter of law."

On cross-appeal, the Neumeisters allege that the district court abused its discretion in refusing to tax the costs of original depositions to Mock as part of the judgment.

### IV. STANDARD OF REVIEW

[1,2] An action to set aside inter vivos transfers of property on the basis that they were made as the result of undue influence is one in equity and, as such, is reviewed by an appellate court de novo on the record.[2] Despite de novo review, when

---

[2] See *Peterson v. Peterson*, 230 Neb. 479, 432 N.W.2d 231 (1988).

credible evidence is in conflict on material issues of fact, the appellate court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another.[3]

[3] The decision of a trial court regarding taxing of costs is reviewed for an abuse of discretion.[4]

## V. ANALYSIS

### 1. Undue Influence

#### (a) Settled Principles of Law

We begin by summarizing well-settled principles governing an action to set aside a deed on the basis of undue influence. This establishes our framework.

[4-6] The elements which must be proved in order to vitiate a transfer of property on the ground of undue influence are that (1) the transferor was subject to undue influence, (2) there was an opportunity to exercise such influence, (3) there was a disposition to exercise such influence, and (4) the transfer was clearly made as the result of such influence.[5] The undue influence which will void a deed is an unlawful or fraudulent influence which controls the will of the grantor.[6] The court, in examining the matter of whether a deed was procured by undue influence, is not concerned with the rightness of the conveyance but only with whether it was the voluntary act of the grantor.[7]

[7-9] The burden is on the party alleging the execution of a deed was the result of undue influence to prove such

---

[3] See, *Hopkins v. Hopkins*, 294 Neb. 417, 883 N.W.2d 363 (2016); *Goff v. Weeks*, 246 Neb. 163, 517 N.W.2d 387 (1994).

[4] *Martensen v. Rejda Bros.*, 283 Neb. 279, 808 N.W.2d 855 (2012).

[5] *Fremont Nat. Bank & Trust Co. v. Beerbohm*, 223 Neb. 657, 392 N.W.2d 767 (1986).

[6] *Rule v. Roth*, 199 Neb. 746, 261 N.W.2d 370 (1978).

[7] *Caruso v. Parkos*, 262 Neb. 961, 637 N.W.2d 351 (2002).

undue influence by clear and convincing evidence.[8] Clear and convincing evidence is evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved.[9] Mere suspicion, surmise, or conjecture does not warrant a finding of undue influence; instead, there must be a solid foundation of established facts on which to rest the inference of its existence.[10]

### (b) Contrasting Standards

Mock's petition for bypass proposed to address whether the standard of proving undue influence should be different depending upon whether the transfer was inter vivos or testamentary. Traditionally, we have applied different burdens of proof. In an equitable action, the proponent of an undue influence theory bears the burden to prove each of the elements by clear and convincing evidence.[11] On the other hand, in a will contest, undue influence need only be proved by the greater weight of the evidence.[12]

[10] But Mock's brief assigns no error to the district court's application of the equity standard, and his brief recites it in defining our scope of review. To be considered by an appellate court, an error must be both specifically assigned and specifically argued in the brief of the party asserting the error.[13] Because he did neither, we do not address it.

---

[8] *Id.*

[9] *In re Estate of Mecello*, 262 Neb. 493, 633 N.W.2d 892 (2001).

[10] *Caruso v. Parkos, supra* note 7; *Craig v. Kile*, 213 Neb. 340, 329 N.W.2d 340 (1983); *McDonald v. McDonald*, 207 Neb. 217, 298 N.W.2d 136 (1980); *Zych v. Zych*, 183 Neb. 708, 163 N.W.2d 882 (1969).

[11] *Goff v. Weeks, supra* note 3.

[12] See, *Hartley v. Metropolitan Util. Dist.*, 294 Neb. 870, 885 N.W.2d 675 (2016) (equivalent burdens); *In re Estate of Price*, 223 Neb. 12, 388 N.W.2d 72 (1986) (will contest burden).

[13] *In re Claims Against Pierce Elevator*, 291 Neb. 798, 868 N.W.2d 781 (2015).

### (c) Mock's Formulation of Error

#### *(i) Parties' Contentions*

Mock's first two assignments of error assert, respectively, that his evidence justified an inference of undue influence and that the Neumeisters failed to rebut the inference. This formulation appears to be driven by language from two of our opinions: *In re Estate of Hedke*[14] and *In re Estate of Clinger*.[15]

[11] In *In re Estate of Hedke*, we discussed a "presumption of undue influence." We began with a truism: One does not exert undue influence in a crowd; it is usually surrounded by all possible secrecy. This led to the unremarkable legal proposition that undue influence is usually difficult to prove by direct evidence and that it rests largely on inferences drawn from facts and circumstances surrounding the testator's life, character, and mental condition.[16] Depending upon the evidence in a particular case, these inferences may drive a fact finder's conclusion.

But, after observing that the ultimate burden of persuasion for undue influence remains with the contestant throughout the trial, we stated that our "case law on the proof necessary to rebut a presumption of undue influence is inconclusive."[17]

Mock now invites us to "clarify that the burden[-]shifting framework [of *In re Estate of Hedke* and *In re Estate of Clinger*] applies to the undue influence challenge to inter vivos conveyances of real property in this case."[18] On the other hand, the Neumeisters assert that in *In re Estate of Clinger*, we "altogether abandoned the 'presumption of undue influence.'"[19]

---

[14] *In re Estate of Hedke*, 278 Neb. 727, 775 N.W.2d 13 (2009).

[15] *In re Estate of Clinger, supra* note 1.

[16] See *In re Estate of Hedke, supra* note 14.

[17] *Id*. at 745, 775 N.W.2d at 29.

[18] Brief for appellant at 6.

[19] Brief for appellees at 12.

Moreover, they argue that we "create[d] even more confusion" by discussing an inference of undue influence.[20]

### (ii) Reasoning of In re Estate of Clinger

In *In re Estate of Clinger*, one of the issues on appeal was the trial court's refusal of the contestants' proposed instructions regarding a "presumption" of undue influence. We reaffirmed our holding from 1977[21] and declared that "the concept referred to as a 'presumption of undue influence' in will contests is not a true presumption" within the meaning of Neb. Rev. Stat. § 27-301 (Reissue 2016).[22] We noted that several of our cases after 1977 referred to an "'inference' of undue influence,"[23] and we discouraged use of the phrase "presumption of undue influence."

Our core holding in *In re Estate of Clinger* merely rejected using the term "presumption of undue influence" in a jury instruction. We observed that "sound reasons dictate against using the language of presumption in charging the jury in a will contest"[24] and that "the language of presumption becomes unimportant and potentially misleading"[25] where the contestant met the burden of going forward and the proponent met the burden of producing contrary evidence. We explained that in a jury trial, "[a]n instruction that a 'presumption' of undue influence exists would conflict with the statutory burden of persuasion that must be satisfied by the contestant" and "could easily be seen by a jury as placing the judge's imprimatur on the contestant's claim."[26] Thus, our holding

---

[20] *Id.* at 14.

[21] See *McGowan v. McGowan*, 197 Neb. 596, 250 N.W.2d 234 (1977).

[22] *In re Estate of Clinger, supra* note 1, 292 Neb. at 253, 872 N.W.2d at 51.

[23] *Id.* at 249, 872 N.W.2d at 48.

[24] *Id.* at 252, 872 N.W.2d at 50.

[25] *Id.* at 253, 872 N.W.2d at 50.

[26] *Id.* at 253, 872 N.W.2d at 50-51.

in *In re Estate of Clinger* really has little to do with the case before us.

In the course of discussing the difference in terminology, we observed: "If a contestant's evidence shows a confidential or fiduciary relationship, coupled with other suspicious circumstances, the contestant has introduced evidence sufficient to justify an inference of undue influence. In other words, that evidence is sufficient to sustain the contestant's prima facie case of undue influence."[27] This was not new. We had previously said:

> In an undue influence case the burden of proof, or the risk of nonpersuasion on that issue, is on the plaintiff and remains there throughout the trial. . . . In an action based on undue influence, when a confidential relationship exists between the parties, and a prima facie case is established, the burden of proof remains on the plaintiff, but the burden of going forward with the evidence shifts to the defendants.[28]

We then said that "[t]he inference of undue influence may be rebutted by proof that the testator had competent independent advice and that the will was his or her own voluntary act."[29] But the case from which we drew this language added, "or by other evidence of the circumstances surrounding the execution of the will."[30] This language from *In re Estate of Clinger* and our statement in *In re Estate of Hedke* about inconclusive case law seems to have distracted the parties from the decisive question.

### (iii) Effect of Inferences

Given Mock's assignments of error, the burden-shifting framework is of little import in this case. Mock's first two

---

[27] *Id*. at 253, 872 N.W.2d at 51.

[28] *Anderson v. Claussen*, 200 Neb. 74, 80, 262 N.W.2d 438, 441-42 (1978).

[29] *In re Estate of Clinger, supra* note 1, 292 Neb. at 253-54, 872 N.W.2d at 51.

[30] *In re Estate of Novak*, 235 Neb. 939, 947, 458 N.W.2d 221, 227 (1990).

assignments of error assert that the district court erred in failing to set aside the disputed instruments. He challenges the court's ultimate conclusion and does not assert error in failing to grant the bench trial equivalent of a directed verdict.

A motion to dismiss at the close of all the evidence has the same legal effect as a motion for directed verdict.[31] A party against whom a motion to dismiss is directed is entitled to have all relevant evidence accepted or treated as true, every controverted fact as favorably resolved, and every beneficial inference reasonably deducible from the evidence.[32] A "prima facie case" means that evidence sufficiently establishes elements of a cause of action and, notwithstanding a motion for a directed verdict in a jury trial or a motion to dismiss in a nonjury trial, allows submission of the case to the fact finder for disposition.[33] Although Mock moved to dismiss the Neumeisters' counterclaim, he never moved for the bench trial equivalent of a motion for directed verdict as to his claim. Admittedly, a plaintiff has little reason to do so in a bench trial. And while the Neumeisters did move to dismiss Mock's case, both at the close of his case and at the close of evidence, they assign no error to the overruling of their motions.

Because no error is assigned to any ruling on a motion to dismiss made during the trial, the question is not whether Mock sustained his initial burden of production or whether the Neumeisters thereafter sustained some burden of production. The district court effectively determined that each had done so. The court properly gave its attention to the ultimate issue— whether Mock sustained his burden of persuasion.

The question now is whether this court, upon our de novo review, will reach a different conclusion regarding the

---

[31] *American Central City v. Joint Antelope Valley Auth.*, 281 Neb. 742, 807 N.W.2d 170 (2011).

[32] *Id.*

[33] *Id.*

elements of undue influence, taking into account the inferences flowing from the evidence. We return to where we began. The four elements of undue influence are settled law. And the district court ultimately focused on the correct elements.

In our de novo review, witness credibility is crucial. Mock dedicated a portion of his brief to attack Gail's credibility, and we have considered his arguments. But we also give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another.[34]

### (d) Evidence as to
### Undue Influence

[12] In the context of a will contest, we have stated that it is not necessary for a court in evaluating the evidence to separate each fact supported by the evidence and pigeonhole it under one or more of the four essential elements and that the trier of fact should view the entire evidence and decide whether the evidence as a whole proves each element of undue influence.[35] We apply the same concept to a claim of undue influence in an action to set aside a deed.

The evidence shows that Gail was long a part of Landgraf's estate planning and that Landgraf had previously contemplated giving or selling some of his land to Gail. Landgraf's 1999 will nominated Gail as the personal representative, bequeathed all of Landgraf's farm equipment to Gail, and gave Gail $2,000. Gail was present when Landgraf executed the 1999 estate planning documents, and Hoch testified that he would not have allowed Landgraf to sign the will if Hoch had concerns about undue influence by Gail. In August 2005, Hoch prepared a real estate transfer statement in connection with a gift to the Neumeisters of approximately 10 acres of Landgraf's land, but the transaction never occurred. In 2007,

---

[34] See *Hopkins v. Hopkins, supra* note 3.

[35] See *In re Estate of Hedke, supra* note 14.

Landgraf conferred with Horan about "gifting or selling" 240 acres to the Neumeisters, but Horan never heard back from Landgraf. Horan did not have any concerns that Gail was influencing Landgraf. Then, in 2011, Landgraf met with Werts about giving a quarter of his land immediately to Gail and selling other land to the Neumeisters for $350 per acre. As noted at the outset, Landgraf ultimately gave approximately 1,000 acres to the Neumeisters. Werts did not believe that Landgraf's conveyances to the Neumeisters were the result of undue influence.

After Jerome died in 2000, Landgraf had no surviving immediate family. We agree with the district court's finding that "over time, . . . Landgraf developed a very close and almost familial relationship with Gail." The evidence established that Landgraf depended on Gail and called on Gail whenever he needed assistance. While that may have made Landgraf more susceptible to influence by Gail, it also provides a logical reason for Landgraf to give a considerable amount of his real estate to the Neumeisters.

Piper, who appears to be a disinterested witness, testified that Landgraf told her he planned to give his land "to his farmers." That is precisely what Landgraf did through his 2011 estate planning documents. Although the Neumeisters had stopped farming Landgraf's land in 2005, no one has farmed it since that time. And while the Neumeisters received considerably more land and received it immediately, Landgraf also gave to the Knakes and to Witte the land each was farming. Mock does not contend that those gifts were the result of undue influence.

This was not a clear-cut case. At first blush, Mock's recitation of facts in his brief makes a strong argument. But the Neumeisters' evidence reveals a more nuanced situation. After carefully considering the entirety of the record, we are not firmly persuaded that the deeds executed by Landgraf were the result of undue influence asserted upon him by Gail.

## 2. Counterclaim

The district court determined that the Neumeisters' counterclaim was moot. On appeal, Mock requests that we dismiss the counterclaim for lack of evidence if we reverse the district court's decision regarding the setting aside of the deeds. Because we affirm the court's decision that the deeds were not the result of undue influence, we need not further address this assigned error.

## 3. Taxing of Costs of Original Depositions

Prior to entry of the decree, the Neumeisters filed a motion to determine and tax costs, seeking $3,025.59 to be taxed as part of the judgment. Those costs included expenses paid for the original depositions of five individuals. On cross-appeal, the Neumeisters argue that the district court erred in failing to tax the costs for original depositions against Mock. We disagree.

[13] This action sounds in equity. The taxation of costs in equitable actions is governed by Neb. Rev. Stat. § 25-1711 (Reissue 2016).[36] This statute provides that "the court may award and tax costs, and apportion the same between the parties . . . as in its discretion it may think right and equitable."[37] Although the statute addresses when a court may tax costs, it does not specify what costs are taxable.[38]

[14] Assuming without deciding that the depositions could be taxed as costs, the district court was not required to tax those costs to Mock. Unlike Neb. Rev. Stat. §§ 25-1708 and 25-1710 (Reissue 2016), which provide that costs "shall be allowed of course" to the successful party, § 25-1711 gives the court discretion to tax costs and to apportion such costs

---

[36] *City of Falls City v. Nebraska Mun. Power Pool*, 281 Neb. 230, 795 N.W.2d 256 (2011).

[37] § 25-1711.

[38] See *City of Falls City v. Nebraska Mun. Power Pool, supra* note 36.

between the parties. We cannot say that the court abused its discretion in declining to tax the deposition costs to Mock.

## VI. CONCLUSION

We conclude that Mock failed to prove by clear and convincing evidence that the deeds at issue were the result of undue influence. We find no abuse of discretion by the court in declining to tax the costs of depositions to Mock. Accordingly, we affirm the district court's decree.

AFFIRMED.

KELCH and FUNKE, JJ., not participating.