IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF LOUIS W.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LOUIS W., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

MARIO J., APPELLANT, AND ESTHER W., APPELLEE AND CROSS-APPELLANT.

Filed January 15, 2019.   No. A-18-504.

Appeal from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Darin J. Knepper, Deputy Scotts Bluff County Public Defender, for appellant.

Leonard G. Tabor for appellee Esther W.

MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Mario J. appeals and Esther W. cross-appeals from the order of the Scotts Bluff County Court, sitting in its capacity as a juvenile court, terminating their parental rights to their minor child, Louis W. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

Louis' birth came as a surprise to his parents, Esther and Mario. In September 2017, Esther went to the emergency room complaining of indigestion or menopause and learned that she was pregnant and in labor. After Louis' birth, Esther and Mario were immediately contacted by Anna

- 1 -

Harberts with the Department of Health and Human Services (DHHS). Following Harberts' investigation, the State filed a motion for temporary custody of Louis and a petition requesting that Louis be adjudicated a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Specifically, the State alleged that such adjudication was necessary due to Louis' parents' inability to care for him; that Louis lacked safe, stable, and sanitary housing; and that Louis' parents suffered from significant mental health concerns. The petition also alleged that Louis was a minor child of Native American Heritage and subject to the provisions of the Indian Child Welfare Act (ICWA).

An affidavit by Harbert accompanied the State's motion for temporary custody. That affidavit set forth, in part:

> The hospital knows [Esther] well due to her mental health issues. Esther has Schizo Affective Disorder and is on Haldol and multiple medications. She has a history of outbursts and volatility. Esther also is developmentally delayed. The alleged father of the baby Mario also has significant mental health issues and is developmentally delayed. He is prone to violent outbreaks. Both parents have a payee, and the reporter thinks Mario has a guardian (per NDEN he does not have a guardian). Mario plans to be on the birth certificate. The psychiatric APRN Cheryl Phinney who knows Esther well formally evaluated both parents today and concluded that she would have profound concern for mom's ability to care for baby. During evaluation Mario was rocking back and forth and playing a game on [sic] phone and would not engage in conversation. When Cheryl was in the room the baby had a coughing/choking fit. Neither parent acknowledged this or did anything. Cheryl had to intervene. Since birth when the baby cries neither parent acknowledge[s] this or respond[s], and nurses have to prompt Esther to try to care for him . . . .

She also stated:

> Esther came to hospital . . . and is covered with 100 or more bug bites and reports their apartment is infested with bed bugs. Esther has nothing ready for the baby and no resources. Esther has repeatedly said she cannot take the baby home in a few days because she doesn't have anything ready and no way to keep him safe. Esther said she had never taken care of a baby. She said she could feed him, but doesn't know if she could burp him. She reported she had been able to keep her cat alive, but her roommate that lives down stairs [sic] beat it up, but cat is okay now. Mario would not answer any questions about caring for the baby. . . .

The court granted the motion for temporary custody on September 25, 2017, and, upon Louis' discharge from the hospital, he was immediately placed into foster care.

In October 2017, the State filed an amended petition requesting that Louis be adjudicated a child within the definition of § 43-247(3)(a), that Esther's parental rights be terminated pursuant to Neb. Rev. Stat. § 43-292(5) (Reissue 2016), and that Mario's parental rights be terminated pursuant to § 43-292(2), (5), and (9). In connection with that amended petition, the State issued an "Indian Child Welfare Act Notice" directed to Navajo Children's and Family Services, P.O. Box

1930, Window Rock, AZ, which set forth that a termination petition involving Louis had been filed which alleged that Louis was a member, or was eligible for membership, in the Navajo Indian Tribe. The court then set both the adjudication hearing and termination hearing for December 21.

On December 1, 2017, both Esther and Mario filed motions to continue the adjudication and termination hearings. An affidavit attached to Mario's motion set forth:

> Affiant is still waiting on whether the Navajo Tribe will be intervening in the above matter. Your affiant was told . . . that the Navajo Tribe's Office of Vital Records has a pending case for Louis [W.] . . . to determine his eligibility in the Navajo Tribe, and that it has not been completed yet.

Following a hearing, the court denied the requests to continue the adjudication hearing, but granted a continuance of the termination hearing. Following the December 21 adjudication hearing, the court adjudicated Louis as a child within the meaning of § 43-247(3)(a).

The termination of parental rights hearing, which had been continued at the parties' request, was held in March 2018. The State called as witnesses Cheryl Phinney, a psychiatric and family nurse practitioner; Harberts; Charlene Russell, a family advocate; Morgan Weitzel, a DHHS child and family services specialist; and Stacy Behne, a Nebraska State Patrol crime analyst. The following witnesses testified for either Esther or Mario: Reverend William Voss, Shanlee Cross, Sharon Russell, and Daniel Palomo. Additionally, the court received the following exhibits into evidence: exhibit 6, a certified copy of JV 16-188, a case where Mario's parental rights to another child were terminated; exhibit 7, Mario's Colorado judgment, conviction, and sentence for sexual assault on a child; exhibit 8, a letter from Colorado's Legislative Legal Services and certification of the statute under which Mario was convicted; and exhibits 9 and 10, Dr. Gage Stermensky's parenting capacity evaluations for Esther and Mario. There was no testimony or other evidence offered governing the status of Louis as an Indian child.

## 1. EVIDENCE PRESENTED BY STATE

### (a) Cheryl Phinney

Phinney, a psychiatric and family nurse practitioner, testified that she evaluated Esther when she was still hospitalized after giving birth to Louis. When she went to perform the evaluation, she had documentation that Esther had been admitted to the behavioral health unit three times. She testified that Esther had schizoaffective disorder, which includes a "level of psychosis." Esther was taking Haldol, an antipsychotic medication; however, she stopped taking other medications without direction to do so because Esther "thought she had gone through menopause and didn't know whether or not she should take the medication." The medications Esther stopped taking were identified as Lamictal, a mood stabilizer; Effexor, an antidepressant; and Cogentin, a drug which reduces the symptoms caused by Haldol. According to Phinney, it was important for Esther to take Lamictal because Esther's schizoaffective disorder comes with high and low moods. Esther told Phinney that she was a little bit depressed, irritable, and angry and that she was having some minimal hallucinations. Esther also told Phinney that she came to the emergency department because her stomach hurt and she did not know she was pregnant. Phinney recounted that there was one incident where Louis began to cough and a "nurse came in, repositioned the child and

suctioned the baby, and neither one of the parents really noted." During Phinney's 55-minute evaluation, she noted no overt bonding between the parents and Louis.

(b) Dr. Stermensky's Parental Capacity Evaluations

Dr. Stermensky completed comprehensive parental capacity evaluations of both Esther and Mario. Esther's evaluation was received into evidence as exhibit 9 and Mario's evaluation was received into evidence as exhibit 10.

*(i) Esther's Evaluation*

Dr. Stermensky's evaluation of Esther noted that Esther was born in 1973 and that she was diagnosed with schizoaffective disorder when she was 19. The evaluation documented Esther denied having ever "heard voices or saw things that other people couldn't see and hear" and when asked why she was diagnosed with schizophrenia or schizoaffective disorder, she stated "ask the doctors, I don't know." The report further noted that Esther agreed that she had been diagnosed with posttraumatic stress disorder, but disagreed with the diagnosis. Dr. Stermensky found that Esther had mild intellectual development disorder but he noted that it was difficult to clearly diagnose the disorder because some of the symptoms associated with intellectual disability may be due to her severe and persistent psychotic disorder.

Dr. Stermensky's evaluation noted that Esther "reports significant persecutory ideation such as believing that others seek to harm her. She is suspicious of and alienated from others, and experiences interpersonal difficulties as a result of suspiciousness, and lacks insight." Dr. Stermensky included a report he reviewed which documented Esther telling Phinney that she had been experiencing "residual audio hallucinations." His evaluation indicated that Esther reported that she had a miscarriage while hospitalized but stated that a doctor "had it deleted from the computer system."

Dr. Stermensky recommended that Esther attend a 12-step program, receive parenting training, and receive ongoing random drug and alcohol screening. He noted that, during substance abuse treatment, "it will be important for the therapist to recognize that [Esther] will have difficulty acknowledging the full nature and ramifications of her substance abuse problem." Further, Dr. Stermensky reported that Esther's "insight regarding her current situation, responsibility, family relationships, and legal vs. illegal activity appeared limited" and that "she exhibited no empathetic awareness of what her child is likely experiencing as a result of her past actions."

Dr. Stermensky noted that Esther "lacks insight into her emotional state, likely from her propensity towards blaming other[s] . . . and substance abuse history. She is likely confused by her own and other[s'] emotions" which "brings into question her potential for acknowledging and addressing emotional issues" Louis experiences or for showing empathy for Louis. He observed that, despite long-term therapy and medication management, Esther struggles to develop new coping skills and parenting skills. Dr. Stermensky also noted that Esther "struggles maintaining hygiene needs" and there are "noted concerns regarding her ability to cook, clean, provide transportation and hygiene needs for her child based on current adaptive functioning deficits." After listing off problems with Esther's ability to parent, Dr. Stermensky stated that because of her "compromised cognitive functioning, many of these deficits are not amenable to treatment

- 4 -

interventions." In the evaluation, Dr. Stermensky concluded that Esther was not capable of caring for Louis.

### (ii) Mario's Evaluation

Dr. Stermensky also performed a comprehensive parental capacity evaluation of 47-year-old Mario. Dr. Stermensky found that Mario presented symptoms consistent with having a moderate intellectual development disorder, posttraumatic stress disorder, unspecified paraphilic disorder, and unspecified bipolar and related disorder. He also listed cocaine use, inhalant use, and alcohol use disorders, all severe and in full remission pursuant to Mario's self-reporting.

Mario acknowledged to Dr. Stermensky that he had been diagnosed with several potential psychiatric or mental problems. He reported sleeping 2-3 hours per night during the month prior to the evaluation, that his insomnia usually lasts for a few weeks, and that he hears voices during the times when he cannot sleep. Mario also reported long-term anger problems, hypersexuality, impulsivity, and a suicide attempt, which led to his hospitalization. Mario reported he has been hospitalized twice for suicidal ideation. According to Mario, he had been receiving disability since he was 17 years old because of "slow learning disease."

The parental capacity evaluation included Mario's criminal history dating back to 2006 and listed 19 separate times Mario had been incarcerated between 2006 and 2016. Mario's criminal history included convictions for, but not limited to, felony strangulation, third degree domestic assault, violation of a protection order, and two counts of failure to use a child passenger restraint. Mario admitted to being incarcerated once for strangling Esther and another time for assaulting Esther. Dr. Stermensky found that Mario lacked insight into what behaviors are legal and what behaviors are illegal.

Dr. Stermensky reviewed documentation of a DHHS intake and included it in his report. The intake described children, ages 17, 13, and 11, who were allegedly abandoned by their mother and living with Esther and Mario. The intake described the concerns of the children's extended family members that Mario was giving gifts to the younger two children and "'brainwashing' them into thinking he is a great guy," but that Mario had other motives. The intake report stated that "Mario has stated that he wants to take the two younger children and move to Cheyenne."

Dr. Stermensky stated that Mario's "current level of intellectual functioning will impact his ability to be a parent and he may feel emotional attraction to individuals with similar intellectual and cognitive resources. Secondary to low IQ, he has extremely immature problem-solving abilities and social understanding. He has been abusive to [Esther]." He concluded his report with several recommendations including monitoring contact with Esther "to protect [Esther] as a vulnerable adult" and that "visitation, if pursued, should be monitored and for limited periods of time, never unsupervised based upon [Mario]'s violent history, [and] sexually maladaptive behavioral convictions." Dr. Stermensky concluded that Mario was not capable of providing sufficient care for Louis.

### (c) Charlene Russell

Russell, a family advocate, worked with Esther and Mario since November 2017 to provide supervised visitations with Louis and one-on-one family support meetings. During the most recent

3 to 4 weeks prior to the hearing, the family had an extended 4-hour supervised visit each week instead of two 1-hour visits. Russell explained that at these extended visits, Esther would sometimes get "very frustrated with Mario due to her feeling that he's taking over the visit." Russell would explain to Esther that it was a "team effort" where Esther and Mario were working together as parents, that Mario was not trying to take over the visits, and that Russell was not trying to say that Esther was doing anything wrong. But Russell explained, "that's how she perceives him stepping in and helping whenever Louis is needing to be fed or needing to be changed . . . and her emotions can escalate at times." When Esther would get frustrated, Russell testified that she would have to de-escalate Esther, because Mario would not. When Esther's emotions would escalate, Mario would sometimes remove himself from the room, often to prepare a bottle, and when he returned, Russell would usually have de-escalated the situation with Esther. Russell observed that sometimes Esther can de-escalate herself, but usually if she started to get upset, Russell needed to redirect Esther in order to calm her down. Russell testified that during every visit in which she took part, there were incidences which would cause Esther to escalate her emotions, or experience "moments of panic."

Russell has worked one-on-one with both Esther and Mario for family support. During these one-on-one family support meetings, she would work with the parent on issues related to soothing techniques for Louis, nutrition, how to care for Louis' acid reflux, which then later progressed to topics such as emotional regulation, anger management, and setting healthy boundaries. Russell related that even during one-on-one family support visits, both Esther and Mario were easily distracted and Esther often fixated on other issues and seemed unable to devote her full attention to Louis.

Further, despite working on the same skills since November 2017, Esther and Mario still needed constant redirection regarding basic parenting skills including holding, feeding, diapering, playing with, and giving eye contact to Louis. Russell stated that the parents did not make the progress that she would expect to see in that timeframe and the visits never progressed to a point where she would have been comfortable with unsupervised or semisupervised visits.

(d) Morgan Weitzel

Weitzel, a DHHS child and family services specialist, was Louis' case manager since October 4, 2017. Weitzel testified that "the level at which [Esther and Mario are] learning and adapting is not keeping up with the rate at which Louis is growing and developing." Weitzel detailed the significant difficulties Mario and Esther were having with their visitations. She stated that "there has been very little progress in parenting skills." The following exchange took place near the end of her testimony:

Q. [by State] What's the department's position as it relates to Louis and his best interests when it comes to his termination of his biological parents' rights?

[Esther's counsel]: Object on foundation.

THE COURT: It's overruled. You can answer.

A. The department's stance is that it would be in Louis' best interests to have parental rights terminated for both parents.

Q. [by State] Why?

A. They have not shown that they have the capacity to keep up with Louis' development or to adapt to his needs without extensive support and prompting and redirection. It's just not sustainable and not in Louis' best interests for that to be a struggle throughout his life.

Weitzel described the interaction between Mario and Esther at team meetings to be tenuous, stating they both talk over each other and Esther often gets frustrated with Mario and will snap at him. She testified that the degree of escalation that was happening so rapidly and without regard to who is there was a "red flag."

### (e) Stacy Behne

Nebraska State Patrol crime analyst Behne, who also works with State Patrol's sex offender registry division, testified that based upon Mario's Colorado sexual assault of a child conviction, which had been separately offered and received into evidence, he would be monitored as a sex offender for life. Behne testified that the victim in the Colorado case was Mario's relative and was 9 or 10 years old.

### 2. EVIDENCE PRESENTED BY ESTHER AND MARIO

### (a) Sharon Russell

Sharon Russell testified that she met Mario and Esther at church about 2 years ago, that she often sees Mario with his nieces and nephews at church, and that Esther and Mario treat children "very well." She testified that she knows Mario is a registered sex offender, that the victim was a child, and that she would leave her children in their care.

### (b) Shanlee Cross

Cross testified she has known Mario for about 11 years, she trusts him, and he has watched her son and daughter. She testified that "he helps around the house with us" and her children "like being around him."

### (c) Reverend William Voss

Reverend Voss testified he has known Esther and Mario for about 6 or 7 years as participants in worship as well as volunteers in his church's volunteer organization. He stated this has included "a fair amount of interaction through the week" and he has never seen any problems in their interactions with small children, or any indication of them being on drugs, drunk, or abusive to each other.

### (d) Dan Palomo

Palomo, an alcohol and drug counselor, testified that Mario started treatment in January 2017. He testified that both Mario and Esther have completed an intensive outpatient treatment program, which is a 6-week program to help participants maintain sobriety and develop coping skills. He believed Mario had been clean for about 3 years and that Esther had been clean for about 4 years.

## (e) Esther

Esther testified that she and Mario will be moving to an apartment which will cost them $525 per month which is $75 less per month than their current residence. Esther testified that they might need WIC and Medicaid to cover some expenses for Louis, but that they will be able to support Louis. Esther further testified that people leave their children with Mario and that Cross left her children with Mario overnight.

## 3. Termination Order

Following the hearing, the court terminated both Esther's and Mario's parental rights, finding that the State had established by clear and convincing evidence that termination of Esther's parental rights was established pursuant to § 43-292(5) and that termination of Mario's parental rights was established pursuant to § 43-292(5) and (9). The court found:

> In the present case, both parents are simply incapable of parenting Louis. The court does not believe [Esther] would intentionally hurt Louis but it is clear that she cannot provide for his basic needs, which includes protection in a dangerous world. [Mario] is a more complicated individual. Dr. Stermensky opined that [Mario]'s low intellectual capacity could cause attraction to individuals with similar intellectual and cognitive resources, which may explain his attraction to children. [Mario]'s parental rights to another child were terminated within the last 12 months. He is a convicted sex offender; the victim was a child.

The court found by clear and convincing evidence that termination was in Louis' best interests. The court specifically found:

> In the present case, both parents are unfit and cannot perform reasonable parental obligations. There is not a bond between the parents and the child. The court cannot find any beneficial relationship between the parent and child. The court finds Louis would be in continual danger of significant harm if he were placed in his parents [sic] care. Generally, the danger would be from the inability of the biological parents to care for the child. However, [Mario]'s criminal past and tendency to be attracted to children, place Louis in danger of intentional abuse as well.

Both Mario and Esther timely appeal.

## III. ASSIGNMENTS OF ERROR

Both Esther and Mario have assigned as error that the court erred in finding that the statutory grounds for termination under § 43-292 (5) and (9) were met and termination of their parental rights was in Louis' best interests. Esther independently assigned as error, and argues in her brief, that the court erred in allowing Weitzel's opinion testimony on termination over her foundational objection. Mario independently assigns as error, and argues in his brief, that the court erred in ordering termination without finding, by clear and convincing evidence, that active efforts were made to prevent the breakup of the Indian family and without finding, beyond a reasonable

doubt, that continued custody by Mario was likely to result in serious emotional or physical damage to Louis.

There were also errors identified by either Esther or Mario that were either assigned as error, but not argued in their briefs, or were argued in their briefs, but not assigned as error. Esther assigned as error, but did not argue in her brief, that the court erred by not finding that continued custody by Esther was likely to result in serious emotional or physical damage to Louis. Similarly, Mario assigned as error, but did not argue in his brief, that the court erred by finding that Louis should be adjudicated under § 43-247(3)(a). Finally, Esther argued in her brief, but did not assign as error, that the court erred by ordering termination without a finding that the State made active efforts to prevent the breakup of the Indian family. To be considered by an appellate court, an error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017). Thus, we do not consider errors that were not both assigned as error and argued in Esther's and Mario's briefs.

## IV. STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Shayla H. et al.*, 17 Neb. App. 436, 764 N.W.2d 119 (2009). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id*.

## V. ANALYSIS

### 1. ERRORS RAISED BY BOTH ESTHER AND MARIO

### (a) Statutory Grounds for Termination

Both Mario and Esther assigned that the court erred in finding that there was clear and convincing evidence to support the statutory grounds for termination alleged in the State's petition to terminate their parental rights. Because we find that termination was appropriate under § 43-292(5) as to both Esther and Mario, we do not examine the arguments regarding any of the other statutory grounds. See *In re Interest of Kendra M. et al.,* 283 Neb. 1014, 814 N.W.2d 747 (2012) (only one statutory ground for termination need be proved in order for parental rights to be terminated).

Section 43-292(5) allows termination when, in addition to a determination that termination is in the best interests of the child, "[t]he parents are unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period."

### (i) Applicability to Esther

Esther has been diagnosed with mild intellectual development disorder and schizoaffective disorder, which includes a level of psychosis. The second condition produces mood swings and requires medication. Dr. Stermensky noted that Esther reported significant persecutory ideation such as believing that others sought to harm her. He noted that she was suspicious of, and alienated from, others and experienced interpersonal difficulties as a result of suspiciousness and that she

lacked insight. He included a report which documented that Esther experienced "residual audio hallucinations."

Phinney testified that when she first met with Esther in the hospital following Louis' surprise birth, she had documentation of Esther being admitted to the behavioral health unit on three previous occasions. Prior to Louis' birth, Esther had discontinued the use of certain prescription medications. During their first visit, Esther told Phinney that Esther was irritable, depressed, angry, and having minimal hallucinations. Esther also told Phinney that Esther did not know that she was pregnant and told Harberts she did not know how she became pregnant.

Dr. Stermensky noted that due to her condition, Esther struggles to maintain hygiene needs which he reported posed concerns for her ability to cook, clean, provide transportation, and hygiene needs for Louis. Dr. Stermensky reported that Esther's "insight regarding her current situation, responsibility, family relationships, and legal vs. illegal activity appeared limited" and that "she exhibited no empathetic awareness of what her child is likely experiencing as a result of her past actions." He further noted she "lacks insight into her emotional state, likely from her propensity towards blaming other[s] . . . and substance abuse history. She is likely confused by her own or other[s] emotions." He stated "this brings into question her potential for acknowledging and addressing [Louis'] emotional issues" and showing empathy for him. He observed that despite long-term therapy and medication management, Esther struggles to develop new coping and parenting skills. Dr. Stermensky concluded Esther was not capable of caring for Louis and stated that, due to her "compromised cognitive functioning, many of these deficits are not amenable to treatment interventions."

Dr. Stermensky's opinions and insights were consistent with the recorded observations of case workers who worked with Esther. During supervised visits, Esther experienced difficulty managing and responding to Louis' and, her own, needs. Testimony from Phinney, Russell, and Weitzel, established Esther's lack of responsiveness to Louis' basic needs, lack of bonding with him, lack of coping skills, and lack of parenting skills.

Esther likewise experienced difficulty in coping with Mario and consistently "escalated" her behavior when Mario was present. This required caseworkers to intervene in the situation to de-escalate Esther so she could resume caring for Louis. Esther struggled to make eye contact with Louis, determine when he was hungry, in need of a diaper change, or in need of her attention. Case workers noted a lack of progress in their attempts to teach Esther the most basic parenting skills.

Based upon our de novo review of the record, we find that there is clear and convincing evidence that Esther is unable to discharge her parental responsibilities because of mental illness and deficiency and that there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period.

*(ii) Applicability to Mario*

Mario has been diagnosed with moderate intellectual developmental disorder and symptoms consistent with posttraumatic stress disorder, unspecified paraphilic disorder, and unspecified bipolar and related disorder. Mario self-reported bouts of insomnia where he would hear voices. He also reported anger problems, hypersexuality, impulsivity, and suicide attempts. As a result of his conditions, Dr. Stermensky noted that Mario lacks insight into what is legal and

illegal. Mario now has an extensive criminal history and he has been convicted of sexual assault of a child and is being monitored as a sex offender for the remainder of his lifetime. He was incarcerated on 19 separate instances between 2006 and 2016 which included incidents involving the assault and strangulation of Esther.

Dr. Stermensky opined that Mario's level of intellectual functioning rendered him incapable of caring for Louis. Dr. Stermensky noted Mario had extremely immature problem-solving abilities and social understanding. He stated the lack of social understanding will impair Mario's ability to relate to Louis, understand him, and teach him to interact appropriately with others. As a result, Dr. Stermensky recommended monitored visitation with Louis due to Mario's violent and several maladaptive behaviors and further recommended monitored visits with Esther in order to protect her as a vulnerable adult.

Like Esther, Dr. Stemensky's opinions and insights were consistent with recorded observations of caseworkers who worked with Mario. During supervised visits, Mario was lacking in the most basic parenting skills, often needed to be redirected after months of working on those skills, and lacked the ability to de-escalate Esther when working together to care for Louis. In short, Mario consistently demonstrated that he was incapable of caring for Louis. After our de novo review of this record, we find clear and convincing evidence that Mario is unable to discharge his parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period of time.

Accordingly, we find the court did not err in finding there were sufficient grounds to terminate the parental rights of Esther and Mario's pursuant to § 43-292(5).

### (b) Best Interests

Both Mario and Esther also assign that termination of their parental rights is not in Louis' best interests.

A juvenile's best interests is the primary consideration in determining whether parental rights should be terminated; however, a parent's interest in the accuracy and justice of the decision is also a commanding one. *Kenneth C. v. Lacie H.*, 286 Neb. 799, 839 N.W.2d 305 (2013). With respect to the best interests of a juvenile in termination of parental rights proceedings, "the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child." *In re Interest of Athina M.*, 21 Neb. App. 624, 634, 842 N.W.2d 159, 166 (2014). A finding that termination of parental rights is in the best interest of the child must be made by clear and convincing evidence. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

Courts presume that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012). Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State proves that the parent is unfit. *Id.* Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.*

- 11 -

When termination is sought under subsections of § 43-292, other than subsection (7), the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

As we previously stated, following his birth, Louis was immediately removed from Esther and Mario and placed in the care and custody of the State. Following that removal, the State was actively involved in working with Esther and Mario in order to determine whether the family could be reunified. During that period of time, both Esther and Mario exhibited an inability to properly care for Louis including, but not limited to, determining when Louis was hungry and in need of nourishment, in need of a diaper change, in need of their attention, providing eye contact and support, showing empathy, and otherwise bonding with Louis. The testimony established that those limitations were a product of their mental illnesses and deficiencies. In the case of Mario, the evidence not only established his inability to care for Louis, but demonstrated a safety concern based upon his specific criminal past. As to both Mario and Esther, Dr. Stermensky opined that neither are capable of properly caring for Louis and that the limitations involved here could not be resolved over time. In sum, the evidence clearly and convincingly established that Mario and Esther were unfit parents and that it was in the Louis' best interests that Mario and Esther's parental rights be terminated.

## 2. ERRORS RAISED BY ESTHER ONLY

Esther contends that the court erred in allowing Weitzel's opinion testimony on termination over her foundational objection.

In termination of parental rights hearings, the Nebraska Evidence Rules do not apply. *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017). Instead, due process controls and requires that fundamentally fair procedures be used by the State in an attempt to prove that a parent's rights to his or her child should be terminated. *Id.*

In this case, Esther argues that Weitzel's opinions governing whether terminating Esther's parental rights was in Louis' best interests should have been excluded for insufficient foundation. The record here indicates that Weitzel is a DHHS child and family services specialist and had been assigned as case manager since October 2107. She testified to having spent considerable time with Esther and documented her observations in connection therewith. Based upon her background, experience, and first-hand knowledge of the case, Weitzel offered her opinion as to Louis' best interests as it related to parental termination. She was available for cross-examination and fully explained her positions. The court's decision to allow her testimony was fundamentally fair as it related to the issue of termination of parental rights. As such, the court's decision overruling Esther's foundational objection to Weitzel's opinion testimony on whether termination of her parental rights was in Louis' best interests did not violate due process.

## 3. ERRORS RAISED BY MARIO ONLY

Mario contends that the court erred in terminating his parental rights without a finding that active efforts had been made to prevent the breakup of the Indian family and in failing to find beyond a reasonable doubt that placing Louis with him would be likely to result in serious

emotional and physical damage to Louis. The county court would, in fact, be required to make these findings in the event that the termination proceeding were governed by the Nebraska Indian Child Welfare Act (NICWA).

Originally, there was some concern by the State that this termination proceeding may be subject to the NICWA. After filing the petition to terminate, the State sent notice to the Navajo Children's and Family Services in October 2017 identifying Louis as a person of possible Indian descent and apprising them of the proceedings. Later, in connection with a motion to continue filed by Mario's counsel, counsel attached an affidavit in which he stated there was an open case to determine if Louis was eligible for enrollment as a Navajo with no response by the tribe at that point in time. At a February 7, 2018 hearing, the court asked "[a]nd ICWA was alleged but not applicable; correct?" and the State confirmed that "[a]s far as we know at this time, yes."

A party seeking to invoke a provision of NICWA has the burden to show that the act applies in the proceeding. *In re Adoption of Kenten H.*, 272 Neb. 846, 725 N.W.2d 548 (2007). See, also, *In re Interest of Nery V. et al.*, 20 Neb. App. 798, 832 N.W.2d 909 (2013). It is applicable "when the court knows or has reason to know that an Indian child is involved." Neb. Rev. Stat. § 43-1505 (Reissue 2016).

At the termination hearing, neither Esther nor Mario offered any evidence that Louis was of Indian descent or any evidence that NICWA should apply to these proceedings. Accordingly, we find that Mario did not meet his burden of establishing that NICWA applied to this case. Because neither Mario, nor anyone else, satisfied their burden that NICWA applies to these proceedings, we hold that the court did not err in terminating their parental rights without a finding that active efforts have been made to reunite the family or that placement of Louis with Mario was likely to result in serious emotional or physical damage to Louis.

## VI. CONCLUSION

In sum, we find that the assignments of error which were properly raised are without merit. As the county court observed, Mario and Esther are not culpable, but are not capable or fit parents either. Finding no error, the order terminating Mario and Esther's parental rights is affirmed.

AFFIRMED.

- 13 -