IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE ESTATE OF CLASON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE ESTATE OF RUTH E. CLASON, DECEASED.

STEVEN E. CLASON, APPELLANT,

V.

SUSAN J. BAYLISS, PERSONAL REPRESENTATIVE, ET AL., APPELLEES.

Filed September 10, 2019.    No. A-18-380.

Appeal from the District Court for Furnas County: DAVID W. URBOM, Judge. Affirmed.

Siegfried H. Brauer, of Brauer Law Office, for appellant.

David W. Rowe, of Kinsey, Rowe, Becker & Kistler, L.L.P., for appellee Susan J. Bayliss.

Roger L. Benjamin, P.C., for appellees Lee A. Clason and Jim J. Clason.

Damien J. Wright and Sara A. Larson, of Welch Law Firm, P.C., for appellees Deshane Nelson et al.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

Steven E. Clason (Steven) appeals from the order of the Furnas County District Court granting summary judgment in favor of Susan J. Bayliss (Susan), the personal representative of the estate of Ruth E. Clason (Ruth). Susan sought to have Ruth's 2011 will admitted to probate. Steven challenged the 2011 will on grounds of testamentary capacity and undue influence; he sought the admission of a 2008 will. On appeal, Steven claims error with regard to the admission

- 1 -

and exclusion of certain evidence, and he also disagrees with the district court's decision that there was no undue influence with regard to the 2011 estate planning documents. We affirm.

## BACKGROUND

Ruth and her husband, F.W. Eugene Clason (Eugene), who predeceased Ruth, had eight children, all now adults. The children who stood to benefit from Ruth's 2011 will and trust were Susan, Steven, Lee A. Clason (Lee), Jim L. Clason (Jim), deceased, and Bonnie S. Wright (Bonnie). Three other daughters were specifically excluded as beneficiaries in Ruth's 2008 and 2011 estate planning documents.

### RUTH'S ESTATE PLAN HISTORY

On March 31, 2008, Ruth executed the "Last Will and Testament of Ruth E. Clason" (the 2008 will), a pour-over will to a revocable trust titled the "Clason Living Trust" (the 2008 trust) and any amendments to that trust. The 2008 trust was executed by Ruth and Eugene that same day. Under the 2008 will, Ruth appointed Eugene as her personal representative, or alternatively, Steven (or Susan if Steven was unable or unwilling to serve in that capacity). Under the terms of the 2008 trust, Steven and Susan were appointed to serve as successor cotrustees once both Ruth and Eugene were no longer able or willing to do so. Susan, Steven, Lee, Jim, and Bonnie were named beneficiaries, but Ruth's and Eugene's three other daughters "and the descendants of each of them" were specifically and intentionally excluded from receiving any part of the estate. The five children identified above were to each receive specific devises of real property; the remainder property was to be distributed in separate and equal shares.

Eugene died in May 2010. In September, Ruth executed an amendment to the 2008 trust only to the extent of appointing Lee as cotrustee with her effective immediately, or if Lee was ever unable or unwilling to serve as a trustee, Susan (or Bonnie in the event Susan was unable or unwilling to do so).

On July 13, 2011, Ruth executed the "Last Will of Ruth E. Clason" (the 2011 will), which revoked "any prior wills and codicils" she had made. The 2011 will was a pour-over will to a revocable trust, the "Ruth E. Clason Living Trust" (the 2011 trust). Ruth executed the 2011 trust on the same day as she executed the 2011 will. The 2011 will nominated Susan and Lee as Ruth's co-personal representatives, and the 2011 trust designated Susan and Lee as cotrustees.

As under the 2008 estate plan, beneficiaries of the 2011 estate plan included Susan, Steven, Lee, Jim, and Bonnie. The other three daughters were again specifically disinherited, but unlike the 2008 will, they were "deemed to have predeceased" Ruth, and any references to "descendants," meant her "children and their descendants, including descendants of any deceased child." Therefore, in contrast to the 2008 estate plan, which would have divided any remainder interest in one-fifth shares between the five children who were not disinherited, the 2011 estate plan divided the estate into one-eighth interests, allowing the descendants of the disinherited daughters to benefit. Also unlike the 2008 estate plan, the 2011 trust did not include specific devises of real estate to any beneficiaries.

An "Acknowledgment" signed along with the 2011 trust stated:

> This decision to not include my disinherited children as beneficiaries of the [2011 trust] is made solely by me and without any influence or duress from my other children.

The [2011 trust] benefits the same children and disinherits the same children as my previous trust signed by me in 200[8]. Therefore, by executing the [2011 trust], I am not altering the disposition of my estate.

RUTH'S DEATH AND FILING OF COUNTY COURT ACTION

Ruth died on January 12, 2013. Susan and Lee filed an application in the county court for Furnas County requesting informal probate of the 2011 will and to be informally appointed co-personal representatives. A "Statement of Informal Probate" of the 2011 will was issued, finding it was original, duly executed, and apparently not revoked, and appointing Susan and Lee as co-personal representatives of Ruth's estate in unsupervised administration; Susan and Lee each accepted the appointment.

Steven subsequently filed a petition for formal probate, alleging that he believed Ruth executed the 2008 will, which was the only validly executed will concerning Ruth's estate and that, although not in his possession at the time, the will or a copy of it could be obtained through discovery. Steven asserted that the 2011 will was obtained at a time when Ruth either failed to possess sufficient capacity to validly execute that will or that the 2011 will was created under undue influence or the result of duress, fraud, or mistake. He nominated himself as personal representative for Ruth's estate pursuant to the 2008 will. He requested an order setting aside the "purported" 2011 will and admitting the 2008 will to formal probate. He asked to be appointed as personal representative of Ruth's estate and that the prior appointment of Susan and Lee be set aside.

Susan and Lee denied Steven's petition, sought to dismiss it, and filed a petition seeking formal probate of the 2011 will. They also filed a notice of transfer of the proceedings to the district court.

PROCEEDINGS IN DISTRICT COURT

Susan, as personal representative of Ruth's estate, filed in the district court a motion for summary judgment in favor of the proponents of the 2011 will. She requested that the 2011 will be admitted to probate and that the request to admit the 2008 will be denied. Susan claimed evidence showed there was no genuine issue of material fact and that the proponents were entitled to judgment as a matter of law.

A hearing on Susan's motion for summary judgment took place in October 2017. Susan and Steven were present with their attorneys, an attorney was present on behalf of Lee and Jim, Bonnie appeared pro se, and another attorney appeared by telephone on behalf of a group of interested parties. Susan offered the following: the 2011 will (exhibit 1), Ruth's death certificate (exhibit 2), Eugene's death certificate (exhibit 3), the December 2013 deposition of Jerrod Gregg (Gregg) (the attorney who drafted the 2011 estate planning documents) (exhibit 4), Steven's July 2017 deposition (exhibit 5), Bonnie's September 2017 deposition (exhibit 6), Steven's November 2013 deposition (exhibit 7), Ruth's "Acknowledgement" (exhibit 8), Steven's March 2015 answers to interrogatories (exhibit 9), Susan's affidavit (exhibit 10), and Lee's affidavit (exhibit 11). Steven's counsel and Bonnie each objected to the admission of exhibits 1 through 11; exhibits 1 through 9 were objected to because they were not "on file" 10 days before the hearing, and general objections were made to all of Susan's exhibits based on relevance, hearsay, and foundation.

Receipt of those exhibits was taken under advisement. Steven offered his own affidavit (exhibit 12), Bonnie's affidavit (exhibit 13), and Steven's counsel's affidavit containing attachments of the 2008 will and trust, plus the amendment to it, and the 2011 will and trust (exhibit 14). All opposing parties objected to exhibits 12 and/or 13, generally on grounds of hearsay, foundation, and relevance. Receipt of exhibits 12 and 13 was taken under advisement and exhibit 14 was admitted into evidence. Lee and Jim offered a rebuttal affidavit of Lee (exhibit 15); Steven's counsel and (Bonnie) objected to receipt of that exhibit.

DISTRICT COURT'S ORDER AND STEVEN'S APPEAL

In March 2018, the district court issued its order. It admitted into evidence exhibits 1 through 9. There was no stated ruling upon exhibits 10 and 11, whether admitting or rejecting them; therefore, we do not consider that evidence here. Exhibit 12 was accepted into evidence, except for paragraphs 3 through 11, 13 through 15, 17, 19, and 21 through 28. Exhibit 13 was accepted into evidence, except for paragraphs 4, 6 through 10, 12 through 17, and 21 through 39. Exhibit 15 was not admitted into evidence. The district court found that the 2011 will was a self-proved will such that the proponents of that will met their burden of proof regarding execution and Ruth's testamentary capacity and that Steven failed to present evidence to refute that Ruth had testamentary capacity the day the 2011 will was executed.

Regarding undue influence, the district court found as follows. After Eugene's death, Ruth continued to make financial and business decisions related to her farming operation, was independent and would only ask for help if she needed it, and was strong-willed. After Eugene's death and until the execution of the 2011 documents, Lee and Susan did not try to keep Bonnie from having contact with Ruth, try to isolate Ruth from the rest of Ruth's family, or keep her from communicating with her other children. Steven's only evidence to refute that finding was that "'Mom was nearly always in the presence of Susan, Lee or one or more of Susan's children. They appeared to be attempting to keep her away from one-on-one time with any other family members.'"

The district court further found the change in the distribution of Ruth's estate was not the result of any undue influence. The 2011 will changed distribution of Ruth's assets from the terms of distribution under the 2008 will and trust to include the children of Ruth's disinherited children and the 2011 will changed the nominated personal representatives. The evidence indicated that Gregg was told by Ruth at the June 2011 meeting, "that she intended that the three [disinherited children] and [their] children were not to receive any part of Ruth's estate as she had previously provided in the estate planning documents executed in 2008." However, Gregg did not realize the 2011 documents did not "'mirror'" the distribution of the 2008 estate planning documents until after the 2011 will and trust were executed.

The district court found that there was no genuine issue as to any material fact and that Susan, as personal representative of the estate, was entitled to judgment as a matter of law. It sustained Susan's motion and ordered that the 2011 will be admitted to probate. The court directed that its order be certified to the county court, where further proceedings were to take place.

Steven appeals from the district court's order.

## ASSIGNMENTS OF ERROR

Steven claims, consolidated and restated, that the district court erred by (1) granting summary judgment, specifically with regard to the undue influence determination, and (2) not admitting certain evidence related to the undue influence claim, and relying on statements contained in two exhibits which were not received into evidence. Three appellee briefs were filed in response: one from Susan, one from Lee and Jim, and one from the group of interested parties; the positions taken in each brief align in their opposition to Steven's appeal.

## STANDARD OF REVIEW

Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Colwell v. Mullen*, 301 Neb. 408, 918 N.W.2d 858 (2018). In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Id*.

A trial court has discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Lindsay Internat. Sales & Serv. v. Wegener*, 301 Neb. 1, 917 N.W.2d 133 (2018).

## ANALYSIS

### SUMMARY JUDGMENT

Steven claims that notwithstanding the district court's rejection of parts of his and Bonnie's affidavits from admission into evidence, there remained sufficient evidence to raise a question of fact to overcome summary judgment disposition. He does not dispute the district court's determination of Ruth's testamentary capacity; he disputes only the granting of summary judgment with regard to his undue influence claim.

A party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that it is entitled to judgment as a matter of law. *Wynne v. Menard, Inc.*, 299 Neb. 710, 910 N.W.2d 96 (2018). If the movant meets this burden, then the nonmovant must show the existence of a material issue of fact that prevents judgment as a matter of law. *Id*. When the parties' evidence would support reasonable, contrary inferences on the issue for which a movant seeks summary judgment, it is an inappropriate remedy. *Id*. Where reasonable minds could draw different conclusions from the facts presented, such presents a triable issue of material fact. See *id.*

By statute, contestants of a will have the burden of establishing undue influence and carry the ultimate burden of persuasion. *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015). See, also, Neb. Rev. Stat. § 30-2431 (Reissue 2016). To show undue influence, a will contestant must prove the following elements by a preponderance of the evidence: (1) the testator was subject to undue influence, (2) there was an opportunity to exercise such influence, (3) there was a disposition to exercise such influence, and (4) the result was clearly the effect of such influence. *In re Estate of Clinger, supra*. Yet not every exercise of influence will invalidate a will. *In re*

*Estate of Hedke*, 278 Neb. 727, 775 N.W.2d 13 (2009). Undue influence sufficient to defeat a will is manipulation that destroys the testator's free agency and substitutes another's purpose for the testator's. *Id.*

Because undue influence is often difficult to prove with direct evidence, it may be reasonably inferred from the facts and circumstances surrounding the actor: his or her life, character, and mental condition. *In re Estate of Clinger, supra*. If a contestant's evidence shows a confidential or fiduciary relationship, coupled with other suspicious circumstances, the contestant has introduced evidence sufficient to justify an inference of undue influence. *Id.* Suspicious circumstances include (1) a vigorous campaign by a principal beneficiary's family to maintain intimate relations with the testator, (2) a lack of advice to the testator from an independent attorney, (3) an elderly testator in weakened physical or mental condition, (4) lack of consideration for the bequest, (5) a disposition that is unnatural or unjust, (6) the beneficiary's participation in procuring the will, and (7) domination of the testator by the beneficiary. See *In re Estate of Hedke, supra*.

Keeping in mind the principles of law governing undue influence, we have considered the relevant evidence to determine whether a genuine issue of material fact exists, and we have found none. Even assuming a confidential or fiduciary relationship existed between Ruth and Susan and/or Ruth and Lee, there was no evidence to support suspicious circumstances. The 2011 estate planning documents did not result in a disposition that was unnatural or unjust when considering Ruth wanted the 2011 documents to mirror her 2008 estate planning documents; and notably, Steven has no objection to the 2008 documents. Any difference in the resulting 2011 documents was not the result of influence by any of the children; rather it appears to have been a miscommunication or drafting error. Nor was there evidence that in July 2011 Ruth was in a weakened physical or mental condition, or that any of her children attempted to dominate her or campaign for any kind of special treatment through alterations in Ruth's estate planning documents. Importantly, Ruth obtained an independent attorney for advice and the drafting of the 2011 documents. As can be observed in the summary of evidence below, while it is evident Ruth's children had contentious moments among themselves, there is nothing to suggest any of them mounted an effort to inappropriately influence Ruth's disposition of assets preceding her execution of the July 2011 will and trust.

Bonnie described Ruth as a "very quiet person." While Eugene was alive, Ruth was involved in running their farm operation by working in the field and doing all the bookkeeping except for some of the bookkeeping Bonnie did for her parents' trucking business "in earlier years." After Eugene died, Ruth "[s]omewhat" continued to run the farm. She no longer worked in the field; there was evidence that Lee took over that role. Ruth continued to do the bookkeeping. Sometimes Susan and Bonnie helped with Ruth's bookkeeping, but it would have been Ruth's idea if Susan and Bonnie did so. Bonnie agreed Ruth was generally independent and liked to take care of things herself if she could; however, Bonnie also asserted that "whatever [Lee] said, [Ruth] did."

Steven said Ruth was a hard worker during her life. He claimed that from "the actions" that were occurring and had occurred "almost immediately" after Eugene's death, "it was apparent that [Ruth] was no longer able to make the decisions in that household." She was "having to make decisions to appease other people." Steven later denied that Ruth started to change on her decisionmaking abilities when Eugene passed away. Shortly after Eugene died, Steven said he had

informed Susan and Lee he was the personal representative for Eugene. Susan responded she was "going to get things changed" and Lee told him the same thing and also hit him. Steven thought that sometime around June 2010, Susan used her personal account to pay the former attorney who had drafted the 2008 will and trust for some kind of services he assumed was for Ruth because Ruth wrote a check to Susan that said "attorney fees or something" for that former attorney. He claimed Ruth had never gone through a third party to pay an attorney. According to Steven, around the same time, Ruth was writing "huge checks" to Susan and Susan's children; he asked Ruth about it later and she said it was for their cleaning up after a tornado (in June 2010). He told Ruth his concern about how the check amount was calculated and also about how Lee did not have to record his work hours. He said that "for years" Ruth had figured truck driver's paychecks "right down to the penny." No checks of any kind are part of our record.

Steven and Bonnie did not testify or otherwise present evidence that Ruth exhibited strange behavior from May 2010 (Eugene's death) to July 2011 (execution of new will and trust). Steven asserted that Ruth "had some really severe health needs, and [thought] it was in the fall of 2010, and she was very dependent on 24-hour care." He claimed Ruth had rapid mood swings "on occasion"; he described an incident he thought probably happened after July 13, 2011, involving something Susan said to Ruth about Bonnie. However, incidents occurring after Ruth signed the July 2011 estate planning documents are irrelevant to any claim of undue influence as to those documents.

After Eugene died, Bonnie said she worked for Ruth providing "[i]n-home care" possibly in 2010, 2011, and 2012, consisting of being there "any time she needed help, period, with her healthcare or cleaning [her] house." Bonnie recalled one instance sometime after Eugene's death when Ruth did not know who Bonnie was, but Bonnie could not remember when that happened and there was never any "testing" done on Ruth for any form of dementia. Bonnie did not provide specifics of the type of "healthcare" she provided for Ruth or the frequency of it. In Steven's answers to interrogatories he alleged that Ruth was aged, ill, and hospitalized "for a period and under regular treatment during the final three years of her life"; in his affidavit, he said Ruth spent time in the hospital in 2011. In contrast to Bonnie's testimony that she provided care for Ruth in 2010, 2011, and 2012, Steven stated Lee moved into Ruth's home and became a caretaker for her so she could avoid having to move into an assisted living facility. He claimed Ruth's "deteriorating health" resulted in Ruth being "unable to drive," unable to walk further than her mailbox, and using a "walker" most of the time.

Steven failed to present any evidence from a medical provider to support that Ruth's mental and physical condition were weakened to a concerning extent leading up to and around the date of execution of the July 2011 estate planning documents. Ruth's death certificate shows that she had congestive heart failure which contributed to but did not result in the underlying cause of her death. The immediate cause of her death in January 2013 was endometrial cancer that had begun only "months" before her death. There was no evidence that Ruth would have been particularly susceptible to undue influence based upon her mental or physical condition preceding her execution of the July 2011 estate planning documents.

Bonnie claimed Susan was motivated to exercise undue influence over Ruth so that Susan could be "in control," meaning she wanted to be the personal representative. However, she did not believe Lee or Susan told Ruth to change the distribution of the assets from what was in the 2008

documents to what was in the 2011 documents. Susan had a "life-long history of wanting to be in control of everything." Bonnie recalled conversations with family members sometime before May 2010 regarding concern about Steven being personal representative of her parents' estate and that he would change the parents' decision to disinherit certain children. She also recalled conversations sometime after Eugene died about getting all of her parents' farmland "moved," but Bonnie did not know that anybody even knew what was in the 2008 trust at that time.

Bonnie said it was not Ruth's idea to create the 2011 trust and Ruth did not have knowledge that it was being created in the first place. Only Bonnie and Susan "knew" and Susan was "going to get Lee on board, because anything that Lee would tell [Ruth], she would do, because she could not stay out at the farm if she did not have Lee there to take care of her." Steven claimed that Ruth did not understand the 2011 trust and only signed it because she thought it was the same as the 2008 trust and "needed to comply with the desires of [Susan] and [Lee] to avoid being moved to a nursing home." Bonnie testified that she did not say Ruth was threatened or forced into signing the 2011 will and trust. Steven testified about how, regarding Ruth's personal property, it had come to his attention at some point that Ruth "had complained that [Susan] was asking for all of these things, and her response was I have more than one child." (We note that Ruth's response reflects she did not just give in to Susan's requests.)

Steven alleged that Lee was "rude, verbally abusive and intimidating to Ruth" and threatened to leave Ruth's home if he did not "get to do what he wanted there, and to get paid for being there." Bonnie said that Lee verbally threatened Ruth, specifically, Lee "came home from the field one day and yelled . . . at her[,] used the 'F' word[,] and told her that she better never ever call him again when he was working." But according to Bonnie who was present at the time, Ruth did not say that Lee's behavior bothered her, and Ruth was "familiar" with Lee's behaviors. Steven also related that Susan and/or Lee had used "foul" language that Ruth had to endure.

Steven recalled that Susan emotionally assaulted Ruth on "many occasions"; but his example was from long after execution of the July 2011 will and trust when Ruth was in the hospital just before her death in January 2013. While Steven testified that "the vileness" of Susan, Lee, and Jim affected Ruth's ability to "think clearly" and how it was "very evident to the whole family that they [Susan, Lee, and Jim] abused [Ruth]," most examples of negative family behaviors concerned those among the children themselves. Some examples included a verbal fight when Susan told Lee "to go to hell" and that he did not know how to farm. In June 2010, a tornado hit Ruth's farmstead. Steven did not help with the clean-up process because Lee, Susan, and Susan's children were at the house and he claimed he wanted to avoid them for his own safety. Steven recalled Lee had hit him in the face and stole some of his items in the past. Steven was not present but had heard about how Susan and her children threw rocks at one of Ruth's disinherited children's car when those family members stopped by to look at the tornado damage. Steven discussed incidences involving Lee, Lee's son, and Susan's family where they allegedly were on Steven's property and one of them damaged Steven's "planter tractor" and they took away Eugene's tractor. And he said Susan switched one of his accounts to Ruth's name when Ruth would not have wanted that; Ruth was "embarrassed" and "paid the money back." Steven also discussed how he believed Susan interfered with his plans to have a banquet in Eugene's honor, which Ruth initially agreed to but subsequently changed her mind.

- 8 -

While there were certainly poor behaviors demonstrated among the children and other family members, none of those instances of conflict were directed at Ruth. Even if Ruth was present for some of the described occasions, or was subjected to "foul" language or an occasional irate temper, there is no evidence that such language or the fighting among her children unduly influenced Ruth in executing a new will and trust in July 2011. Steven did not know how often he saw Ruth from May 2010 to July 2011, except for one occasion; but he indicated his infrequent visits were a choice he made so as to avoid contact with his siblings. There was no evidence that he was unable to visit Ruth because Susan or Lee actively sought to block him from doing so. Even Bonnie did not believe that Susan and Lee tried to isolate Ruth from the rest of the family or in any way keep her from communicating with the other siblings following Eugene's death in May 2010 up until Ruth executed the new will and trust in July 2011.

Further, there is no evidence to indicate that Gregg was anything but an independent attorney when he was advising Ruth with regard to the 2011 estate planning documents. According to Gregg, Susan's financial planner asked him if he could send Susan to talk to Gregg because "she had concerns about her mother and her estate plan." The thing that stood out in Gregg's mind regarding Susan's concerns at that time was "the fact that the previous attorney was no longer available or involved and they wanted another set of eyes on things." He agreed that it was not that anything was wrong with the plan. He said it was "possible" that when he first met with Ruth, she or some other family member told Gregg that they could not find the 2008 trust documents, but Gregg could not remember specifics and only remembered that "it wasn't readily available." Susan called the office to schedule an appointment for Gregg to go to Ruth's home to visit with her about her estate plan. He did not believe that prior to his meeting with Ruth, he met with Susan or communicated with Susan about the issues he was to meet with Ruth about.

Gregg's first meeting with Ruth was at her home sometime in mid-June of 2011, which he estimated lasted about 1½ to 2 hours; Susan and Lee were also present. He believed they would have discussed Ruth's estate planning goals and wishes and Gregg would have made recommendations to Ruth based on that conversation. He did not remember Ruth telling him why she wanted someone to counsel with her about her estate plan. There was a discussion about Ruth's and Eugene's previous trust. Based on that discussion, it was Gregg's impression that he was to draft an estate plan providing for equal distribution to all of the children who were not disinherited and that it was not to disinherit any other children that were not already disinherited under the prior estate plan. While at first Gregg denied there was any discussion about the children of the disinherited children, he later said that he understood that Ruth's intent was that the children of disinherited children were not to receive any part of the estate. Gregg never saw any of the prior estate documents during his first meeting with Ruth and she did not give him any of those documents when he left that first meeting. Gregg proposed what he referred to as a generation-skipping transfer tax strategy for the 2011 trust; he said he did not explain the specifics of that.

Gregg was "sure there were statements made" by Susan or Lee regarding information or input into the discussion Gregg was having about Ruth's estate plan during the first meeting, but he did not remember any specifics. Gregg recalled Lee's participation in the first meeting was "very passive" and Susan "participated more in the meeting than Lee did." Susan "did vocalize some things during the meeting," but Ruth took an "active role" in that meeting and was the person

with whom Gregg was specifically communicating throughout the meeting. He did not believe Ruth looked to Susan or Lee for answers.

Gregg indicated he did not have communication with Ruth or with anyone else regarding her estate plan between the first and second meetings. He did acknowledge later that he had telephone conversations with Susan "over time throughout the process" and referred to some emails between him and Susan (Steven's attorney referred to certain emails as being from November 2011). Gregg did not remember specifics of those conversations, only an overall concern about the estate planning and the family members not getting along. One email exchange apparently referred to a family meeting about management issues with the farm and Gregg's agreement to have another family meeting to increase "harmony" among the children to ease administration of the estate in the future. Gregg did not remember if that meeting ever happened. Our record does not contain direct evidence of telephone calls or emails between any individuals.

Gregg said that Susan, Lee, and Bonnie were generally present throughout Gregg's second meeting with Ruth about her estate plan on July 13, 2011. Ruth's neighbors came over later to serve as witnesses; Bonnie remembered that she, her husband, and Susan were in Ruth's presence the whole time Gregg was in Ruth's home on that day and was not sure if Lee was there the whole time. Bonnie said Ruth had "no idea" what she was signing and never had a chance to look at anything. But Bonnie did not know what was discussed between Ruth and Gregg about her estate plan and was not present at the first meeting. Gregg could not recall his exact conversations with Ruth during the second meeting, but said he would have reviewed the conversations and concepts talked about at the first meeting and described all the "major moving parts of the estate plan design." He remembered asking Ruth if the 2011 estate plan was her decision. Gregg indicated that the power of attorney and other ancillary documents, including the 2011 will, were prepared in part because of his suggestion to Ruth to have them included in the plan. Gregg was not aware of the discrepancy regarding distributions when the 2011 trust was signed. He told Ruth that the 2011 trust as drafted, "per the description of the previous [t]rust by Ruth and the family, mirrored the distributions of the previous [t]rust." He said he went over the "Acknowledgment" with Ruth and explained its provisions. He said Ruth indicated who she wanted to have as trustees of the 2011 trust; there was no discussion about whether that was consistent with the 2008 trust.

Gregg recalled that Lee was also "very passive" at the second meeting and, as to both meetings, did not have any input about the substance of Ruth's estate planning. In general, Susan and Bonnie did not have any input about the substance of Ruth's estate planning. Gregg generally stated that he has a sense of when undue influence is happening and anytime there are other people in the room, he concerns himself with other people's statements influencing the statements of the client. He did not sense (in the first or second meeting) that Ruth was being unduly influenced or was the subject of any intimidation or domination by Susan or Lee.

Sometime after July 2011, Gregg performed legal services for Ruth related to her responsibilities as personal representative of Eugene's probate estate. He said that he received probate documents the prior attorney had been working on, which is likely the time he received the 2008 trust and the first time he saw it. It was "obvious" after reviewing the 2008 trust that the distribution plan was not consistent with that of the 2011 trust. The 2011 trust terms defining beneficiaries to be inclusive of the children of Ruth's disinherited children was contrary to Ruth's "intent as described" to him.

Gregg believed that after he reviewed the 2008 trust, he and Ruth had a telephone conversation in which he told her the 2011 trust was substantially different than the 2008 trust. However, when questioned further about that he said, "I don't know if I specifically remember having a conversation with her after that date." Bonnie remembered reading the 2011 trust before Ruth died and that she (Bonnie) saw errors and told Ruth about them; she did not recall what Ruth said in response. Whether or not Ruth was informed of the disparities between the estate plans, the record supports that Ruth did not further change the 2011 will or trust.

There was evidence, however, that Ruth made changes to other documents. Gregg said that within about a couple months after Ruth signed the July 2011 documents, Gregg had a telephone conversation with Ruth about how she wanted to change her power of attorney agent. He said he had talked to Susan about it on the telephone but told Susan he needed to talk directly to Ruth about the matter. Gregg prepared the document changing Ruth's agent and mailed it to Ruth. Further, Gregg said he created a farm lease agreement between Ruth and Lee on Ruth's request by telephone call sometime after the signing of the July 2011 documents. To Gregg, when talking to Ruth during that telephone call, Ruth seemed fine and seemed the same as in his prior interactions with her. He had a subsequent meeting with Ruth in person to go over the lease with her during which the terms of the lease were covered; she wanted some amendments done to alter Gregg's draft of the lease.

Gregg recalled communication with Susan sometime after July 13, 2011, about assets with completion of the "funding worksheet or asset checklist." He would have had a telephone conversation with Susan about the funding worksheet after which Susan emailed him the worksheet and "either deeds or accounts and assets that would be funded in the [t]rust." He did not remember any other communications with Ruth or anyone else regarding the 2011 trust or any funding assets. At a different point during his deposition, Gregg said he did not find out about certain deeds relating to the 2008 estate plan until after Ruth's death; he remembered Ruth had not expressed knowledge of those deeds or the existence of those deeds to him.

As we previously stated, the evidence showed that Ruth was unlikely to have been susceptible to undue influence at times relevant to the execution of the 2011 documents, nor did the evidence reflect that the 2011 documents were changed in such a way as to implicate any possible undue influence. The 2011 documents were intended to mirror the 2008 documents; any resulting differences were the result of a miscommunication or drafting error rather than the result of Susan and/or Lee having directed Ruth to make those changes. Although Susan and Lee were named co-personal representatives under the 2011 will, and the 2008 will made Steven the first alternate personal representative to Eugene, Bonnie recalled conversations with family members sometime before Eugene's death about concerns regarding Steven being personal representative of her parents' estate as he would change their parents' decision to disinherit certain children. More importantly, and as Susan points out in her brief, there was no evidence that Susan or Lee benefitted from the changed distribution of the estate; "it would appear that their personal interests may actually be reduced in the 2011 [t]rust as compared to the 2008 [t]rust." Brief for appellee at 28. There is no evidence in this record to indicate that Ruth was incapable of exercising her own intentions in July 2011, nor is there any evidence that the 2011 estate planning documents were to be anything different from what Ruth had intended in her 2008 estate planning documents.

- 11 -

Although our record and any reasonable inference from it refutes Steven's claim of undue influence, we refer to the principle of law governing undue influence that even a "tie" is not enough to sustain a contestant's burden of persuasion. See *In re Estate of Clinger*, 292 Neb. 237, 254, 872 N.W.2d 37, 51 (2015). The party seeking to establish such influence has not met his or her burden of proof if all of the evidence is circumstantial and the inferences to be drawn therefrom are equally consistent with the hypothesis that undue influence was not exercised and the hypothesis that such influence was exercised. *In re Estate of Clinger, supra*. Mere suspicion, surmise, or conjecture does not warrant a finding of undue influence; instead, there must be a solid foundation of established facts on which to rest the inference of its existence. *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017). The district court did not err in granting summary judgment in Susan's favor.

EVIDENTIARY ISSUES

Steven claims the district court erred when it "rejected a substantial amount of evidence" he offered in his affidavit (exhibit 12) and Bonnie's affidavit (exhibit 13). Brief for appellant at 19. He argues how most excluded paragraphs of those exhibits were admissible. In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *In re Estate of Clinger, supra*. Steven cannot establish prejudice, because the portions of exhibits 12 and 13 excluded from evidence were largely cumulative of other admitted evidence or were not relevant to whether the 2011 will was a product of undue influence upon Ruth. A trial court always has discretion to limit evidence which is irrelevant or needlessly cumulative. See *Brown v. Jacobsen Land & Cattle Co.*, 297 Neb. 541, 900 N.W.2d 765 (2017).

Steven briefly asserts, but does not specifically assign or specifically argue, that the district court's admission of all of exhibits 1 through 9 were in error. He notes that he objected to exhibits 1 through 9 when they were offered to the district court, and then generally asserts that there are many statements that are "clearly based on hearsay and lack foundation contained in the admitted offer." Brief for appellant at 19. He does not, however, explain why that is the case. Also, Steven specifically assigns, but does not specifically argue, that the district court erred in "apparently relying on statements contained in [e]xhibits 10 and 11 in support of its judgment when such exhibits were never received into evidence." *Id.* at 2. The only reference to this assigned error in the argument section of his brief is that the court "made no ruling on receiving or rejecting [e]xhibits 10 and 11," and "[a]s such[,] [Steven] is treating [e]xhibits 10 and 11 as not in evidence." Brief for appellant at 10. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the party's brief. *Stekr v. Beecham*, 291 Neb. 883, 869 N.W.2d 347 (2015). We therefore do not consider Steven's claims related to exhibits 1 through 9, and we already noted that we disregarded exhibits 10 and 11 since they do not appear to have been admitted into evidence.

CONCLUSION

For the reasons set forth above, we affirm the district court's order granting summary judgment in favor of Susan, the personal representative of Ruth's estate.

AFFIRMED.